A. J. GALLOWAY *v.* D. A. JENKINS, Treasurer, and THE CHATHAM
RAIL ROAD COMPANY.

By the Court (PEARSON, C. J., RODMAN, and DICK, JJ, concurring.) 1. It is
competent for a tax payer to file a complaint on behalf of himself and all
other tax-payers in the State, whereby to enjoin the issue of State
Bonds under an unconstitutional Act of Assembly.

2. The Act of the 18th of December 1868, in requiring the Treasurer of the
State to subscribe for stock in the Chatham Rail Road Company, and to pay
for the same by issuing Bonds of the State, is unconstitutional, under
Art 5. § 5, clause 2, of the Constitution of the State.

3. That clause *adds* to the restrictions in the former clause of the same
section, peculiar restrictions of its own in the cases covered by it.

4. A subscription for stock in a corporation and issuing Bonds to pay for
such stock, is *a gift* of the credit of the State, within the meaning of
Art 5, § 5 cl. 2, above.

*Per* RODMAN, J. Even if the Bonds of the State were at par, the General
Assembly could not give or lend its credit without submitting the ques·
tion to the people.

*Also,* The test of Bonds being at par is, whenever in the particular trans-
action the State receives in legal money the sum which she becomes liable
to pay.

*Per* READE and SETTLE, JJ, *dissenting.* The Act of the 18th of Decem-
ber 1868 (above) is constitutional and valid.

*Per* READE, J. 1. *Tax-payers* do not constitute a class, in the sense in which
it is said that one of a class may file such bills as the present in behalf of
the whole class.

2. The injury threatened to that *class* by the issue of bonds, is not so immedi-
ate, certain and irreparable that a Court will give the extraordinary relief
sought here.

3. By "*par*," in the section of the Constitution under consideration, is
meant, *par* value in the particular transaction in which the bonds are
issued.

4. Whether an article (stock, or other thing) purchased in the course of
the particular transaction, is of a par value with the bonds issued for it,
is exclusively a matter for the Legislature to decide; and such decision
cannot be reviewed by a Court..

5. By the Act in question the State does not, either *give* or *lend* its credit;
but *uses* it.

INJUNCTION, dissolved by *Watts, J.,* upon motion in the

Superior Court of Wake, at Chambers, on the 4th day of January 1869.

The complaint, filed upon the 29th day of December 1868, purported to be preferred by the plaintiff in his character as a citizen, tax-payer and property-holder of the State, on behalf of all persons of that class, against D. A. Jenkins, as Treasurer of the State, and The Chatham Rail Road Company.

It alleged that the Company had been chartered by the Act of February 15, 1861, and that its charter had subsequently been amended by Ordinances passed January 30, 1862, and March 11, 1868, and by Acts passed February 5, 1862, August 3, 1868, and August 15, 1868—the material facts of which were given. The complaint then set forth the preamble, and ss. 4 and 5, of the Act of December 18, 1868, entitled " An Act to re-enact and confirm certain Acts of the General Assembly, authorizing the issue of State Bonds to and for certain Rail Road Companies, " as follows:

SEC. 4. The Public Treasurer is hereby directed, whenever the President of the Chatham Rail Road Company shall certify that the grading of the Road between Cheraw in South Carolina, and the Gulf, or some other point on the Chatham Rail Road between Raleigh and the Gulf, has been let to contract, to subscribe to the capital stock of said Company, two million dollars in behalf of the State, which subscription shall be paid by delivering to the President of said Company coupon bonds of the State at par, of the denomination of one thousand dollars, dated October 1st, 1868, and payable in thirty years thereafter, bearing six *per cent.* interest, payable semi-annually, principal and interest payable in the City of New York, said bonds to be signed by the Governor, countersigned by the Treasurer and sealed with " The Great Seal of the State," and issued under the provisions of Chapter 90, Revised Code; *Provided,* That said bonds shall only be issued on the surrender of a like amount of bonds of the State heretofore issued under an act to amend the Charter of the Chatham Rail Road Company, ratified the 15th day of August 1868. On which

surrender the same amount of bonds delivered by said Company to the State under the said act shall be cancelled. Said subscription shall be preferred stock, and pay a dividend of six *per cent.* before any dividend shall be declared on the other stock.

SEC. 5. In order to provide for the payment of the interest which may accrue on the bonds issued as above mentioned, there is hereby and shall be annually, levied and collected a special tax of one twentieth of one *per cent.* on the taxable property of the State, collectable and payable into the Treasury as other public taxes.

It then alleged that the said Company was about to comply withthe provisions of said Act, and apply for the bonds thereby authorized to be issued, and that the Treasurer of the State was about to subscribe to the stock of the Company, and to issue Bonds to it as by such Act required,

The prayer was, that the Treasurer should be enjoined from subscribing for stock and from issuing Bonds as the statute provided; and that the Company be likewise enjoined from accepting such subscription and from receiving such Bonds.

Upon reading the complaint to his Honor below, on motion for the defendants, the injunction theretofore granted upon an *ex parte* application, was vacated and dissolved; and the plaintiff appealed.

*Fowle & Badger, Haywood, and Person,* for the appellant.

*W. H. Battle & Sons, Moore, Bragg, Phillips & Merrimon,* contra.

PEARSON, C. J. On opening the case, the counsel of the plaintiff proved on principle and by authority, that the jurisdiction against irreparable injury is applicable; under the doctrine, that where there is a right common to many, or an injury that would be common to many, a bill will lie in the name of one, in behalf of himself and others, to have the right established, or the injury prevented; on the ground of

avoiding multiplicity of suits; and brought this case within the rule, by the allegation that the plaintiff was a tax-payer.

The counsel of the defendants admitted the application of this doctrine, and stated they were instructed not to raise the objection; for if the General Assembly had power to issue these bonds, their clients had a deep interest in having their validity established; so as to enhance the value of the bonds, before they were put in market; and, if the Legislature had no power to issue the bonds, it was a matter of concern to every citizen of the State, that the question should be settled at the outset, so as to avoid the complication, that would grow out of the ideas of vested rights of repudiation, and the obligation of contracts, should these bonds be put in the market with a cloud over them.

We fully concur in this suggestion. It is better for all sides to have the matter settled now and here; and we were gratified to find that the Court has jurisdiction, and can determine the question in the mode in which it is presented by this bill. *Manly* v. *City of Raleigh*, 4 Jones, Eq. 370. *Mott* v. *Pennsylvania*, 30 Penn. Reports 39.

By the Act of August 1868, chapter 14th, the General Assembly enacts, sec. 1, "that to enable the Chatham Rail Road Company to finish their Road, the Public Treasurer be directed to deliver to the Company coupon bonds of the State, not to exceed two millions of dollars." Sec. 2: "In exchange for said bonds, the Company is to deposit with the Public Treasurer bonds of the Company of the same amount, same interest, and same dates." This Act is of no significance, except to show a conviction on the part of the General Assembly, that the public interest demanded the construction of this Road, and a wish to aid the Company in its construction, provided the General Assembly had power to do so, without a violation of the Constitution.

The provisions of the statute under consideration, are expressed so plainly as to relieve the Court from the task of construction. The tenor and effect of it is, that, to aid in constructing a Rail Road from Cheraw to the Coalfields, the

State subscribes two millions of stock—and to pay for the stock, creates a debt of two millions of dollars, and directs the bonds of the State to be handed to the President of the Company, upon the surrender of the bonds issued under the Act of August, 1868, and in the same bill, a special tax is levied to pay the interest annually.

Under Art. 5, Sec. 5, of the Constitution a question is made: "Has the General Assembly power to create this debt of two millions in aid of the Chatham Rail Road Company, unless the subject be submitted to a direct vote of the people?"

The Section is in these words: "Until the bonds of the State shall be at par, the General Assembly shall have no power to contract any new debt or pecuniary obligation in behalf of the State, except to supply a casual deficit, or for suppressing invasion or insurrection, unless it shall in the same bill, levy a special tax to pay the interest annually. And the General Assembly shall have no power to give or lend the credit of the State, in aid of any person, association or corporation, except to aid in the completion of such Rail Roads as may be unfinished at the time of the adoption of this Constitution, or in which the State has a direct pecuniary interest, unless the subject be submitted to a direct vote of the people of the State, and be approved by a majority of those who shall vote thereon."

The statute under consideration complies with the first clause, and the question depends upon whether the two clauses of this Section are to be treated as being separate and independent of each other, or as being so connected as to mean: "*Until the bonds of the State shall be at par,*" the General Assembly shall have no power to create any new debt or pecuniary obligation (except in two specified cases), unless a special tax be levied in the same bill to pay the interest—and in addition to this restriction, although the interest of the new debt is provided for, if the purpose be to aid any person, association or corporation, in respect to a Rail Road, Navigation or other like object, the General Assembly shall have no power to give or lend the credit of the State, unless the sub-

ject be submitted to a vote of the people (except in two specified cases.)

The two clauses being in the same section, and connected by the conjunction " and," would naturally lead to the inference that they are to be taken in connection; and that the second is superadded to the first, with a view of making a further restriction upon the power of contracting a new debt or pecuniary obligation, in the cases covered by it. This inference is not conclusive; and leaves the question, in some degree, open for the application of other rules of construction.

The section under consideration is worded with much precision, and without the use of expletives; the terms are intensified. In the first clause the two exceptions have the effect to make it read: "shall have no power to create any new debt or pecuniary obligation *whatever*, except," &c.,—not even to build a Penitentiary, unless a special tax, &c. In the second clause, the two exceptions have the effect to make it read: " shall have no power to give or lend the credit of the State, *in any case whatever*, except" &c., " unless the subject be submitted to a vote of the people; " so, the intention to restrict the power of the General Assembly in regard to increasing the public debt in any mode or manner, is as strongly expressed as the English language can do it. In matters of construction, the Court is not to confine itself to the particular section; but is to consider the entire instrument, in order to find the general purpose, and the object arrived at.

" To maintain the honor and good faith of the State untarnished, the public debt regularly contracted before and since the rebellion, shall be regarded as inviolable, and never to be questioned." Art. 1, § 6.

" No law shall be passed to raise money on the credit of the State, or to pledge the faith of the State, directly or indirectly, for the payment of any debt, &c., unless the bill is read three times on three different days, and unless the yeas and nays on the second and third readings of the bill shall have been entered on the Journal."—Art. 2, § 16.

" The General Assembly shall, by appropriate legislation,

and by adequate taxation, provide for the prompt and regular payment of the interest on the public debt, and, after the year 1880, it shall lay a specific annual tax upon the real and personal property of the State, and the sum thus realized shall be set apart as a sinking fund, to be devoted to the payment of the public debt."—Art. 5, § 4.

Here, we have a declaration of a purpose to maintain the honor of the State, and pay off the public debt,—a rebuke of hasty legislation, in reference to raising money and pledging the faith of the State,—and an announcement that, although the debt is so large that it cannot be paid off for years, yet the interest must be paid promptly, and a sinking fund be provided for the discharge of the principal. This purpose could not be effected without putting a stop to the increase of the public debt, by restricting the power of the Legislature. Accordingly, that restriction is made by the next Section, which in effect forbids the General Assembly from creating any new debt whatever, " except," &c. without providing for the interest; and in respect to debts or pecuniary obligations contracted by giving or lending the credit of the State, in aid of any person, association, or corporation, that shall be done in no case whatever, " except," &c., unless the subject is submitted to a vote of the people; " *until the Bonds of the State shall be at par*."

But the Court is also required to look at the previous legislation, by which the evil, calling for these cumulative restrictions was caused, and this will furnish a key to the meaning, and open it so plainly to view, " that he who runs may read."

The war debt has been put out of the way by a dash of the pen. It will be found, that most of the public debt was incurred in three modes: 1st, by subscribing for stock in Rail Road and navigation companies, and issuing bonds to pay for the stock, the State becoming a member of the corporation; this is the heaviest item, and amounts to, say eight millions of dollars: 2nd, by issuing bonds of the State, and exchanging such bonds for a like amount of the bonds of the corporation, the State not becoming a stockholder, and taking collateral

security of more or less value; this is the next heaviest item,. and amounts to abount three millions of dollars: 3d. by endors-- ing the bonds of corporations and taking a mortgage or some other collateral security; this item amounts to about two. millions.

These are the three modes, by which, judging from the past,. it was apprehended the public debt might be so run up, as to ruin the credit of the State, and tarnish her honor, and her reputation for good faith.

Is the construction admissible, by which the Constitution is. supposed to guard against two of these sources of danger, and leave the public interest exposed to the other ?   And that, the one most fruitful of evil ！  Would we impute wisdom to an individual, who having a field exposed on three sides, should carefully fence up two of the sides, and leave the other side open ?

Let us see, what word is relied on to justify this construc- tion; for it rests on a single word.  " And the General Assem- bly shall have no power to give or lend the credit of the State, in aid," &c.   It is the word " give," and the argument is:  This was a regular business transaction—the State subscribes for stock and becomes a member of the corporation, and creates a debt by issuing its bonds to pay for the stock; true, the pur- pose was to aid the corporation in making a Road which will greatly benefit the State; but, this is in no sense *giving* the credit of the State; for the State receives a consideration, to wit: the stock; and to give, is to do an act gratuitously; to pass something for nothing.   In construing an instrument, the words must be taken in their ordinary meaning in connection with the purpose for which they are apparently used   " To give," is sometimes used to convey the idea of a gratuity; but it has a much broader meaning.   " Give," means to pass from one to another, and the idea of its being done for or without a. consideration is not involved.   In old conveyances " give and grant" is used in place of *dedi et concessi.*   I will *give* you my horse for yours ?   What will you *give* me for my horse ?' What did you *give* for your house and lot ?   I will *give* you a.

thousand dollars for it—provided you will *give* me six months credit.

This is obviously the sense in which the word is used in the section under consideration. For, besides the purpose which, as we have seen, the framers of the Constitution had in view, it is used in connection with the word *lend,* which imports a gratuity, and is introduced, lest the word "give" might be confined to cases where a consideration passed, and to cover the whole ground; so as to show that the credit of the State was not to be used in any way, either for a consideration or as a gratuity. The General Assembly shall have no power to give the credit of the State to this corporation, by making a subscription for its stock, is one sense. The General Assembly shall have no power to give the credit of the State to this corporation by an exchange of bonds, is another sense. The General Assembly shall have no power to give the credit of the State to this corporation by endorsing its bonds, is another sense. And the section might have included this class, without the additional word "lend." But its being used, shows an extreme solicitude to cover every supposable case in which the credit of the State might be used, whereby the public debt would be increased.

In the first clause of the Section, " to contract any *new* debt," covers the whole ground, without the additional words " or pecuniary obligation." It is remarkable, that these two are the only instances in which the use of what might seem to be an expletive word is resorted to, showing an extreme anxiety that the intention to cover the whole ground should be plainly expressed.

The suggestion, that the credit of the State was given by this statute to aid in the completion of an *unfinished Rail Road,* was not strongly urged on the argument, and, indeed, it could not be. An unfinished road is one that has been begun, and partly worked on, and such a road is made an exception, on the ground that it might be proper to finish it; in order to prevent a sacrifice of the work that had been done. There is no evidence that such was the fact in regard to this road.

The other suggestion, that the State has a direct pecuniary interest in this road, was properly abandoned. The word *has,* is in the present tense; the exception, is obviously confined to roads in which the State had a direct pecuniary interest at the time of the adoption of the Constitution; otherwise the State might, by a subscription for stock, become directly interested in every Rail Road or Navigation scheme, that should thereafter be projected; and thus, the restrictions of the Constitution would be of no effect, whatever.

Our opinion is, that the statute under consideration is void, and that the General Assembly had no power to pass it, without submitting the subject to a vote of the people.

In making this decision, we are relieved in some measure, from our feeling of responsibility, by the fact, that if the public interest imperiously calls for the construction of this road, the Constitution provides that it may be done, if such be the will of the people.

RODMAN, J., *concurrente.* The nature of this case has been so fully stated in the opinion of the Chief Justice, that I may enter *in medias res,* without making any useless repetition. It was admitted by the counsel, who argued this case on both sides with unusual ability, that the plaintiff as a tax payer, was entitled to appear in Court and ask for the relief which he demanded, if he could make a case entitling him to it, and thus the case was properly in Court. I think these admissions were properly made, and shall enter into no discussion of that part of the case.

The material question is, whether that part of an act of the General Assembly, ratified on the 18th of December, 1868, which relates to the Chatham Rail Road Company, (§§ 4, 5, 6,) taken in connection with the act of which it is amendatory, violates § 5 of art. 5, of the Constitution of the State, and transcends the constitutional power of the General Assembly.

In any argument on this subject, it must be admitted that the power of the Legislature, over the subject, is supreme, unless restricted by the article of the Constitution cited. It

must also be admitted, that the article of the Constitution. means *something*, that it was intended to operate as *some* restriction of the legislative power, and is not entirely a dead letter, and that it must have the full force which its. words fairly and reasonably import .

Section 5 is divided, by its subject, into two independent clauses, and might well have been put into two sections. The first clause, (omitting the exceptions, which in this are immaterial,) says, until the bonds of the State shall be at par, the General Assembly shall have no power to contract any new debt or pecuniary obligation in behalf of the State," unless it shall, in the same bill, levy a special tax to pay the interest. annually. The requisition to levy a tax has been complied with in the act under consideration, and no question can arise upon this clause.

The second clause then begins. It is connected with the former clause by the conjunctive "and," but it imposes a new and independent additional restriction on the legislative power. The effect of the word "and" is simply to say, as an additional restriction. The additional restriction is superadded in certain special cases to the former general one. In *no case* (omitting the exception) could the General Assembly contract a new debt without imposing a tax. But there is a class of cases in which the Legislature is forbidden to contract a new debt in behalf of the State, even if the State bonds are at par or a tax to pay the interest be imposed, without submitting to it a vote of the people. That class is provided for in the second clause of section 5 : "And the General Assembly shall have no power to give or lend the credit of the State in aid of any person, association or corporation (except to aid in the completion of such Rail Roads as may be unfinished at the time of the adoption of this Constitution, or in which the State has a direct pecuniary interest) unless the subject be submitted to a direct vote of the people of the State, and be approved by a majority of those who shall vote thereon." For the purposes of the present argument, the words in brackets may be omitted;

for it is true, or must be admitted, that the road provided for in the Act of 18th December, 1868, is neither an unfinished road nor one in which the State had, at the adoption of the Constitution, " a direct pecuniary interest."

The Chatham Rail Road, between the termini and the route established by previous legislation, was an unfinished Road, in the legislative meaning of the phrase; but the Road which was to start from one of the termini of the Chatham Road, or from some point on it, and run thence to Cheraw, was a Road which was unfinished, in the sense that it had never been begun, but not in the sense contemplated by the Constitution, which meant only to include those roads which had been begun, but were unfinished at its adoption. We are obliged to give this meaning to that phrase in the Constitution, as any other construction would render it totally ineffective, and defeat any policy which it may be supposed it was intended to enforce.

The question then is reduced to this, does the Act of Dec. 18th, 1868, "give or lend the credit of the State in aid " of the Chatham Rail Road Company or any other person, association or corporation ? If it does, it is prohibited by the clause of the Constitution above cited, which this Court is bound to obey as the paramount law. The question being reduced to these brief dimensions, it seems to me, with all respect for my learned brothers who have come to a different conclusion, that the answer can scarcely be doubtful. Waiving all discussion as to the lexicographical or technical and legal meaning of the word give," as to whether it includes a grant, both with and without valuable consideration, it seems to me to be clear, that the words "give or lend" were intended to include every mode in which the State could render its aid to a Rail Road Company by means of its credit. It would be scarcely respectful to the intelligence of the Convention of 1868, to suppose that they intended to forbid the Legislature from giving the credit of the State without consideration, and yet to allow them to do it on the consideration of a pepper corn, of a certain number of shares of stock of a purely

nominal value. It is said that the Statute of uses, enacted with great care by the English Parliament, had no other effect than to add three words to a conveyance. That was because the Judges were determined to defeat the law. But we can come to the consideration of this question in no such spirit, and with no such purpose. Our duty is to give to the clause of the Constitution the effect which its words plainly import, and not to filter them into a nullity by hypercritical refinement. The construction which I give to this clause makes it mean something; any other construction, in my opinion, makes it mean nothing. Indeed, I do not know how its meaning could have been more clearly expressed. Had it said as the Constitution of Ohio does, " shall not in any manner give or lend its credit", &c—would it have been more expressive or exhaustive of every mode than the present phraseology ?

" Thou shall not kill ! " Would this prohibition be made more forcible by adding " in anyway ?" Assuming the meaning of the word " give " to be what is here contended for, does the State give its credit in aid of the Chatham Rail Road Company, by giving its bonds for stock to be sold by the Company to raise funds to build the road ? The bonds were the credit of the State, and for what purpose could they have been given, except to aid the Company to build the road described in the act ?

These considerations compel me to the opinion that the act of the Legislature is in violation of the Constitutional restriction cited, and can, therefore, have no force, until submitted to and sanctioned by a vote of the people.

In the view which I have taken of § 5, Art. 5 of the Constitution, it is quite immaterial in reference to the act under consideration, whether the bonds of the State are at par or not. The Legislature cannot (even if the bonds are at par) give or lend the credit of the State, in aid, &c., without submitting the question to the people.

This view renders it unnecessary to consider a question, discussed at the bar, as to the validity of a debt contracted by the Legislature, within the first clause of §5 and not within the

exceptions, without laying a special tax to pay the interest. If, for example, the Legislature should contract with some person to build a State House for $100,000, or any other sum, and should issue bonds to him for that sum in payment, without levying a special tax to meet the interest, and if the contractor should in his contract, agree to receive the bonds at par, and it should be so set out and and provided in the act, would such an act be unconstitutional ? Would the fact that the bonds were declared in this particular case to be, and to be received at par, be a substantial fulfilment of the constitutional condition precedent ?

A short discussion of this point in reference to the case in question will not be without value. What does the Constitution mean, when it says, until the bonds of the State shall be at par ? at par with what ? It can only mean at par with gold and silver, or with the legal tender notes of the United States. It cannot mean at par with the work of the contractor, or at par with any piece of land or other property which the State might think proper to buy, because the value of these things is uncertain, and rests only in opinion and agreement. Such a construction would deprive the words " at par " of all definite meaning. Gold and silver (or their legal equivalent) are necessarily the only standards by which the value of the State bonds must be measured. If then in the case supposed, the State should undertake to pay the contractor in State bonds, it would render it impossible to ascertain whether or not the bonds would be at par. In such a case the bonds would not be at par, in the sense of the Constitution, and no legislative declaration, and no agreement in the contract, could make them so, so long as it appeared that they were parted with for a thing of uncertain and unascertainable value. It is a matter of no consequence in the construction of this section of the Constitution, what the bonds of the State ordinarily sell for in the money markets of the world; no Court can ever be called on to say whether at the ratification of a certain Act of Assembly, they were worth 99 or 100. The test in every case must be whether on the particular bonds, issued

under the circumstances supposed, the State actually received in legal money the sum which it became liable to pay. In no other way than by the conversion of the bonds into money, can it be ascertained that they are at par, and in no other way can the policy of the Constitution be effected

These considerations are responsive to some portions of the argument which has been addressed to the Court, but in the view that I take of it they are not necessary to this case

I have not considered, at all, the policy of the Act of December, 18th 1868. With that question I have nothing to do. I feel bound to obey the Constitution which the people of North Carolina have adopted as their supreme law, according to my understanding of it, and to give them the benefit of those restrictions on the legislative power, which, by inserting, they have shown that they considered valuable. I admit, fully, the weight of the observation which has been made, that a Court should not refuse to give effect to an Act of the Legislature as unconstitutional, unless it is clearly so. But, in this case, I have not been able to bring myself to entertain a doubt as to the meaning of the Constitution. I think its words are plain and that we are obliged to give them the effect which I have assigned to them, or to deprive them of all practical effect, and of all sensible meaning whatever, and, so thinking, my course of duty is plain and unavoidable.

I concur, in opinion, with the Chief Justice, and DICK, J.

READE, J., *dissentiente.* I propose to consider, first, whether the Court ought to entertain the suit; and, secondly, whether the act is constitutional.

I. The Constitution declares that the three departments of the Government, the Legislative, Executive and Judicial, shall be kept separate and distinct. The reason for this is so apparent, that it was not thought necessary to declare it. Nothing is less stable than "a house divided against itself:" and division, *i. e.* strife, would be as inevitable between the departments as between individuals, but for the observance of this important, fundamental principle. We have hitherto observed it,

11

and with the best results. There have often been strong inducements to depart from it. During this term of the Court the Legislature adopted a resolution, requesting the Court to advise the Legislature upon the Constitutional provision in regard to " Homesteads." It was a question of great importance, and of general interest, one in which much more was at stake than in the case before us; yet, we were obliged to decline even so much as the expression of our opinion. So, what is known as the Stay-Law, has greatly interested the public, and much anxiety has been manifested to learn the opinion of the Court, in advance of a decision in any given case. In these, and in all like cases, it has been urged, that if the opinion of the Court could be known in advance, it would prevent litigation and allay public excitement. It has not always been pleasant or easy to stand still, and let the billows of public anxiety break against us; yet we have done so, and have been sustained by considerate public sentiment.

I know it is said that we will not depart from that wholesome rule in this case, because here we have a case between parties. If that be so, I admit that my objection is answered. But it must be so in the spirit as well as in the letter, for the Court must not allow itself to be used *under cover*, in violation of a great fundamental principle:—for if it was thought that it would be a source of irritation for one department to interfere with the other in the *light*, how much more if the interference should appear in the *shade !* and if we refused our opinion to the Legislature when asked with the formality and courtesy of a resolution, how will we be justified, if we allow the end to be accomplished indirectly by an individual ?

It is a great and mischievous error to regard legislative enactments as under a cloud, until the light of the Court shines upon them. Why should it be so ? The Legislature is under the same oath and other obligations to observe the Constitution, as is the Court. It is composed of intelligent men, discussion is free, and all questions are considered by committees, and in two houses. And it is now the settled rule of construction that unless an Act is *plainly* unconstitutional, the

Courts are obliged to declare it constitutional. The doubt, if there be any, must be given in favor of the Act, in deference to the Legislature and the people whom they represent. Under this rule, it has been very seldom that the Court has pronounced acts unconstitutional.

I will not be understood as denying the power of the Court to declare acts unconstitutional. I concede the power. It is conservative. It is quite within probability, that a wise Legislature may, through inadvertence, pass an act inconsistent with the Constitution; and, in view of human frailty, it may be conceded that circumstances may influence legislators to commit palpable errors. The desire to do what is supposed to be a great good, or to avoid an evil, may press representatives unconsciously into the adoption of measures in conflict with the fundamental law. In such cases, it is fortunate that another tribunal, the Court, should have the power to arrest it, when it is brought to bear upon the citizens who have the right to demand that their constitutional securities shall be preserved.

How stands this case? On the 18th of December last, the Legislature passed an act directing the State Treasurer to subscribe for $2,000,000 stock in the Chatham Rail Road, and to pay for the stock in the bonds of the State, payable thirty years hence, and providing for a special tax to meet the annual interest. And on the 29th of December, ten days thereafter, before one-tenth of the citizens of the State knew, as we may suppose, that such an act was passed, the plaintiff files a bill in the name of himself, and all other property-holders and tax-payers in the State, to enjoin, not the collection of the tax, but the issuing of the bonds. Will this Court take jurisdiction of such a case? The case was argued before us by nine eminent counsel, and with great ability. It ought to be a complete answer to the question, that neither in England nor America has there been decided a case like it. It is true that the question of jurisdiction was not much labored in the argument. The eminent gentleman who opened for the plaintiff did discuss it, and referred us to divers authorities, but the counsel

for the defendants did not even controvert the question of
jurisdiction, but conceded it—stating that it was desired by
the parties, and the Legislature, and the public, that the Court
should take jurisdiction and decide it.   Thence I derive an
argument against the jurisdiction.   Wherefore this great and
general anxiety ?  we are not informed that any considerable
amount is involved, so far as the plaintiff is concerned; indeed,.
his interest is so inconsiderable that he has not thought proper
to state it in his Bill.   Evidently because it is a great question
of *public policy*.   It is a momentous question, involving the
largest state interests.   On the one side, it is insisted that if
the bonds are allowed to be issued, the State's credit will be
destroyed.   On the other, it is insisted that if the bonds are
not allowed to be issued, it will be impossible to develope the
resources of the State.   But what has this Court to do with
such questions ?   The Legislature represent the people, and it
is their duty and theirs alone, to decide upon questions of
expediency or policy.   The Court is bound by iron rules, to
*decide cases* as they arise between citizens; and I apprehend
that we will have too much occasion to regret any departure
from the old land-marks.   Every body, and all parties, may be
anxious for an interposition now, because each interest is
expecting a favorable decision; but when the result is known,.
then will come the clamor, and the Court will lose its hold
upon the public confidence, which is its life and honor.   If the
Court may interfere now, at what stage of legislation may it
not be called upon to interfere?   It is insisted that it ought.
to do so at the earliest moment, to prevent unconstitutional
burdens upon the citizens, and, therefore, it ought to interfere
*now*, before any rights are vested, or any liabilities are incur-
red.   Why not interfere sooner ?   Why not interfere the
moment an alleged unconstitutional bill is introduced, or at.
least, as soon as it is ordered to be printed ?   Why allow it to
be printed, referred, reported upon, debated, passed, published
and circulated ?   All this must involve expense, and a tax
upon the property-holders.   It is no answer to say that the
Court cannot enjoin the Legislature, but only its ministerial

officers; because, is not the printer, and is not the clerk, and is not the publisher, a ministerial officer? Clearly, as much so as the Treasurer.

I have said that no case like this has occurred before. I say so, because none was cited in the argument, and I have found none upon search. A number of cases were cited, but upon examination, they will be found not to support this.

Of the authorities cited, those most relied on, and apparently most favoring the position in favor of the jurisdiction, are Adams, Eq. 320–1, *Mott* v. *Pennsylvania Rail Road,* 30th Penn. Rep., 39, and *Caldwell* v. *Justices of Burke,* 4 Jon. Eq. 323. There were other cases, but none stronger than these.

It is common learning, that one of a class may sue for himself and all others of the same class: but that is with many restrictions, and I suppose it may be laid down as a *rule,* that one cannot have redress for himself and a class, unless, under the same circumstances, he could have redress for himself alone, if he only were interested. I put the question then: Suppose it were legitimate for the Legislature to legislate so as to affect individuals, instead of the community; and the Legislature had passed an Act, directing the Treasurer to issue a bond, payable thirty years hence, and to collect an annual tax of the plaintiff alone, to pay the interest; could the plaintiff file a bill for a special injunction against issuing the bond? To answer the question, it is only necessary to consider the cases in which special injunctions are granted. The injury sought to be enjoined must be, not merely possible or probable, but *certain and irreparable.* See *Capehart* v. *Mhoon.* Bus. Eq. 30, and a variety of cases in our own reports, of the same class. Suppose the plaintiff had sued for himself alone, and he certainly was not obliged to join the public with him—could he have the special injunction which he seeks?

(1.) Is the injury to him *certain?* That he will even be in existence thirty years hence, when the bonds fall due, is not only *not* certain, but is quite improbable : and that he will be in existence, or will retain his modicum of taxable property,

when the tax is collected, is not *certain*. But suppose that to be certain; then (2) is the injury *irreparable?* The issuing of the bonds is certainly not, and the collection of the tax is not more so; because, *if* it should fall upon him, he might enjoin it *then*, as well as now, or pay it under protest, and recover it back. So we are remitted to the idea, that this suit is not entertained because it is necessary to one, the plaintiff, but to a class, the public.

Adams's Equity, on the very page to which we were referred, lays it down as a rule, where one sues for a class, that "the Court in such cases will not proceed to a decree, until it is satisfied that the interest of all is fairly represented, and that there would be a preponderating inconvenience, in bringing them individually before it." How does it appear to us, that the interests of all are fairly represented? A measure of immense public importance, adopted by a large majority of the representatives of the people, and involving grave Constitutional questions, is brought before us within ten days after its passage, by a single citizen, whose interest, so far as we know, may be covered by a dollar; and is defended only by a mere ministerial officer, and the Chatham Rail Road Company; without any interest at all, and which with unlimited liberality, admit every thing that the plaintiff alleges—not even giving us the benefit of an argument upon the question of jurisdiction, or any other except the naked question as to the power of the Legislature. *Is* the public interest fairly represented, or is it represented at all? Suppose the plaintiff had made such admissions, or that the decision of the Court had been the reverse of what it is—that the law *is constitutional*, and that the bonds may issue, and the tax may be collected; would the public be satisfied to be concluded by such a decision under such circumstances? What would those, who really have to pay the taxes, say when they come to protest against it, and find that they have been concluded by a "man of straw."

But the cases put by Mr. Adams, where one of a class may sue, are not like this. They are cases where creditors—as

creditors under a trust deed—or legatees, having an interest in a common fund, which cannot be administered except as among many, and too many conveniently to be made parties by name—in such cases, one may sue for himself and for all, and when the Court is satisfied that all are *fairly represented,* it will proceed to administer the fund. I admit that these are not the *only* cases, but they are the illustrative ones. The case of *Mott* v. *Pennsylvania Rail Road Company, supra,* was this: The Legislature directed the Treasurer to sell the public canal at auction, with a proviso that the Pennsylvania Rail Road might take it at an advance price of $1,500,000, and, in that event, it should be exempt from taxation. There were three bills considered together by the Court, asking for a special injunction. The first, and the only one that prevailed, was at the instance of the Public Canal Commissioners, who sued, as well as Canal Commissioners as for themselves as tax-payers. They sought to enjoin the sale of the canal, because they had charge of it as public officers, and it was their duty to preserve, and to manage it for the public interest; and further, because the Legislature had not the power to exempt property from its proper burden of taxes. It was proper that they should interfere then, if ever, because the sale was about to be made, and the canal taken out of their hands, and to go into other hands, under terms forever exempting it from taxation. The Court refused to enjoin the *sale,* but enjoined so much of the *terms* as exempted it from taxation. That case is distinguished from this by the fact, that the injury was immediate, certain and irreparable, and was at the instance of persons who had charge of the canal, and who were about to be deprived of the possession and control of it. And the burden of the decision is upon that ground; although it is stated in the opinion of the Court, that they had the right to interfere as tax-payers; but that was not insisted upon in the argument, although it was said in the argument on the other side, that there was no case in England or America, where a corporation had been enjoined from acting under a

legislative enactment; which probably is more than can be maintained.

Another of the three bills, was at the instance of a " loan creditor, " for himself and all other creditors of the same class, alleging that the canal had been built by the State, by borrowing money and pledging the canal and its products, as security for the debt: and the plaintiff alleged, that, by the sale, he and others of his class, would lose their security; but the Court refused to interfere in their behalf, as by the sale they might get their debt, and their injury was not irreparable.

The third bill was at the instance of a stock-holder in the Rail Road, and sought to enjoin the Rail Road from making the purchase, but the Court refused to interfere.

In *Caldwell, et. al.* v. *The Justices of Burke,* 4 Jo. Eq. 323, the plaintiffs sought to enjoin the Justices of Burke county from subscribing for stock in a Rail Road, and laying a tax to pay the subscription. And the Court did not determine the question, as to whether that was the proper mode in which to seek relief, saying: " Though the Court entertains but little doubt upon the question, yet in the view taken of other points in the case, it becomes unnecessary to determine, whether relief, by injunction in this Court, is the proper mode of redress for those citizens of a county who allege grievances from proceedings of this kind; and, therefore, nothing will be said on it." I admit that there was an *intimation* of the opinion of the Court, but it was not a *decision.* The decision of the Court was against the plaintiffs upon the merits, and therefore the question was not important.

It is to be noted that the injunction asked for, is not against levying taxes, but against issuing the bonds. And by no possibility can *that* injure the plaintiff; indeed, it may greatly benefit him; and we have the opinion of the Legislature, competent to pass upon the fact, that it will not only not injure him irreparably, but will greatly benefit him, and all others who are made plaintiffs with him. I admit that the taxes are resultant, and when the question of their imposition comes under consideration, it must be determined,—and not till then.

I suppose the tax may be levied, notwithstanding the decision in this case, unless the Legislature repeal the Act; as the injunction in this case, does not and cannot extend to the tax. As, however, the issuing of the bonds is enjoined, I suppose the tax will be repealed.

I conclude, (1) that the plaintiff is not one of a class with a common interest which can not be determined as well for himself alone, as in conjunction with his class—that one who conceives himself entitled to a "Homestead," may as well file his bill, for himself and all others who claim Homesteads, and invoke the decision of the Court,—or one debtor who claims the benefit of the stay-law may as well ask the interposition of the Court, in favor of himself and all debtors of that class; and (2) that the plaintiff's alleged injury is not immediate, but remote; is not certain, but doubtful; is not irreparable, but remediable: and, therefore, that he is not entitled to the extraordinary relief of a special injunction.

There is one other reason why I think the Court ought not to entertain this suit. It has been already said, that the Act passed in December last. The Legislature, which passed it, is still in session. By the prompt repeal, in substance, of the August Act, upon its unconstitutionality being suggested, that honorable body has shown itself to be jealous of the integrity of the Constitution. The plaintiff is a citizen. The Legislature is his agent. If the Legislature has committed an error, why did not the citizen memorialize the Legislature for a correction of the error? Before that body he and all other citizens, could have had complete redress. Failing to do that, his appeal to the Court is untimely and mischievous.

It is urged as a reason why the Court ought to entertain the suit, that if the bonds are issued under a cloud, they will be depreciated in the market. I grant it. But how can they issue under a cloud, if the rule be, that every Act is valid unless it be *plainly* invalid? If the doctrine obtain, that nice, technical rules are to be observed in passing upon the constitutionality of statutes—if they are not to be presumed to be valid, unless they are *plainly* invalid, then all statutes will be

considered doubtful, until they are demonstrated by the Court. But if the true doctrine be now established, that every statute is to be deemed valid, unless the error be so palpable that he that runs may read, there will be no such troubles as we are now encountering.

II. I proceed now to the consideration of the second question:

Is the Act constitutional?

How ought that question to be approached?

In *Hoke* v. *Henderson*, 4 Dev. 1, speaking of the power of the Court to declare an Act of the Legislature unconstitutional, the learned Chief Justice RUFFIN said:

" The exercise of the power is the gravest duty of the Judge, and is always, as it ought to be, the result of the most careful, cautious, and anxious deliberation.   Nor ought it to be, nor is it, ever exercised, unless upon such deliberation the repugnance between the legislative and constitutional enactments, be clear to the Court, and susceptible of being clearly understood by all.   In every other case, there is a presumption in favor of the general legislative authority recognized in the Constitution.   The Court distrusts its own conclusions, of an apparent conflict between the provisions of the statutes, and the Constitution; because the former has the sanction of the intelligence of the legislators equal to the apprehension of the meaning of the Constitution, and of their equal and sincere desire, from motives of patriotism and conscientious duty, to uphold that instrument in its true sense, and of the present and temporary inclinations at least, of a majority of the citizens, which must be supposed to be known to their representatives, and to be expressed by them.   But even these sanctions are not sufficient to overturn the Constitution, if the repugnance do really exist and is plain."   Note: " and is *plain.* "   It is not necessary that I should cite other authorities, but they are abundant, both in the decisions of the Courts, and in the elementary writers.   The settled rule is, that unless the Act is *plainly* unconstitutional it must stand; if there is any doubt

about it, it must stand, in due deference to the Legislature and the people whose views they are supposed to represent.

Let us consider, then, not whether this Act is unconstitutional, but is it *plainly* so ? Is it susceptible of demonstration to plain minds? Is it so, beyond doubt? It may be₄ said, if that be the rule, then no Act of the Legislature will ever be unconstitutional; because it is not to be supposed that the Legislature will ever pass an Act, clearly and plainly against the Constitution. I have stated, in considering the first question, that a wise Legislature might through inadvertence, inattention, haste, mistake, or the unconscious bias of pressing circumstances, violate the Constitution. Sometimes they do so, and when it is called to their attention they retrace their steps. It so happened with the present Legislature. In August, they passed an Act lending the credit of the State to the Rail Road now under consideration, without either laying a tax, or submitting it to a vote of the people. And when the error was called to their attention in December, they corrected it by the Act which we are now considering. Thence I derive an argument in support of the Act; for, while we admit that a wise Legislature may pass an Act plainly unconstitutional, through inadvertence, &c, yet, can it be that when their attention is directed to it,—when it is fully discussed and considered—the Legislature can do so unwise or criminal an Act, as plainly to violate the Constitution? If the repugnance be *plain*, why the learned and able arguments at the Bar? Or why the division of this Court, as nearly equal as we can be divided? Admit that it *may be* unconstitutional, yet can it be said to be *plainly* so, against the deliberate judgment of a majority of the Legislature, and a division of this Court, after full argument and much consideration ? and note, that it is not sufficient that its unconstitutionality should be plain to any individual Judge's mind, for that may be so by some peculiar process of reasoning, or superior astuteness or vigor of intellect, but is the fact itself plain, and free from any grounds of doubt? It was commended by a very learned and long-experienced Judge, as a safe rule for a jury in a capital case,

if a portion of the jury were well convinced of the prisoner's
guilt, and a portion were in doubt, those, who were well con-
vinced, might very well adopt the doubts of their brethren;
not because their own minds were in doubt, but because the
doubts of their brethren showed that the fact itself was doubt-
ful. If it were not for this wise philosophy, which compels me,
both in courtesy and in sincerity, to admit that the contrary
opinion of my brethren makes the fact doubtful, I should hope
to proceed now to show clearly and plainly, that the Act is
not unconstitutional, but is in all respects valid.

It is not supposed that the occasion for issuing the bonds
comes within any of the exceptions named in the 5th section
of the 5th Article of the Constitution—that is to say, it is not
a " casual deficit," nor an " insurrection," nor an " invasion,"
nor is it "in aid of an unfinished Rail Road," or of one " in
which the State has a direct pecuniary interest." It will,
therefore, simplify the question, to read the section, omitting
the exceptions, as follows·:

" Until the bonds of the State shall be at par, the General
Assembly shall have no power to contract any new debt or
obligation in behalf of the State, unless it shall, in the same
bill, levy a special tax, to pay the interest annually."

The preceding is the first clause in the section, and I propose
to consider (1) the power of the Legislature under that
clause, and (2) whether the act, which we are considering,
comes under it.

1. It was well known to the Convention that the State was
considerably in debt, and that the bonds of the State were
below par—not worth in the market, in coin, more than fifty
cents in the dollar, and that the new bonds could not be worth
more than the old. Under these circumstances what would
the Convention have been likely to do? What ought it to
have done? Authorize the issue of new bonds, to be put upon
the market at fifty cents in the dollar? No. We would
expect the Convention to have done precisely the reverse—
restrain the issue of new bonds, unless they could be disposed
of at par; restrain the promise to pay $100 by taxing the

people, when they had received but $50 for it. With this restriction, the people might well be supposed to be indifferent as to how many bonds may be issued, within reasonable limits: for how can it materially damage the people to issue bonds promising to pay thirty years hence only so much as they receive now? They can not be injured by it, unless it be improvidently expended; and they may be greatly benefitted, as capital is so much needed in our exhausted and impoverished condition, to renew our strength, and develope our resources. This is the illustration:

I have an agent managing my affairs, and I say to him, "You may need funds to carry on my business. If you do, I authorize you to issue bonds in my name, if you can get par for them: but you must not issue my bonds, binding me to pay at some future time more than you get now." With this restriction my agent can not injure me, except by an improvident expenditure. We have stated what the Convention would have been likely to do—ought to have done. Let us now see what it did. It provided that no new debt shall be created unless the bonds are at par. "Until the bonds of the State shall be at par, the General Assembly shall have no power to contract any new debt," &c.

So it seems to be clear, that the only restriction upon the Legislature in contracting debts is, that par value shall be obtained for the bonds: for, to say that a debt shall not be contracted if par value is *not* obtained, is the same as to say, that it may be contracted, if par value *is* obtained. Especially is this so, as the Legislature is omnipotent in its legislative sphere, except in so far as it is restricted by the Constitution. Nor is it meant that the bonds of the State shall be at par in the general stock market, for that is seldom, if ever, the case, and is a matter of indifference to the State; but the meaning is, that par value must be obtained for the bonds at the time they are issued, in any given transaction. If this be the proper construction, then if par value is received for the bonds under consideration, they may properly issue without any special tax. But then it is said, that a special tax is laid in

the same bill, and thence it is insisted, that it was contemplated that the bonds would be issued below par. Grant that for the argument, and still the bonds may issue; for bonds may issue at any price if a special tax is laid. But the Constitution does not say that bonds which are issued at par shall not be secured by a special tax. They may be so secured, as well as those which are issued below par, the difference being, that in one case the special tax *must* be laid, and in the other it *may* be. It being known therefore, that the bonds of the State were below par in the general stock market, how was it competent for the Legislature to order these bonds to issue?

First, because a special tax was laid in the same bill, as the Constitution provides: and,

Secondly, because no special tax was necessary to be laid; for, by the express terms of the act authorizing their issue, it is provided that they shall not issue except at par, as also by Rev. Code, chap. 90, which forbids any State bond to issue, except at par.

But I lay no particular stress upon the restriction in the Rev. Code, because the new Constitution authorizes bonds to issue below par, provided a special tax is laid in the same bill. I have said that the Act provides for their issue at par. The provision is, that the State shall subscribe for $2,000,000 worth of stock in the Rail Road—creating thereby a debt, as for the purchase of any other property—and pay for it with $2,000,000 of bonds, at par. But it is said, that that is only a *cover*, to evade the Constitution! I do not think it either respectful or just to the Legislature thus to declare. It is not so charged in the Bill, and it ought not to be taken for granted. We must expressly declare the contrary. It must not be supposed that the Legislature means otherwise than as it declares; or that it would *evade*, any more than it would directly *assail*, the Constitution. The Act says expressly that they shall be taken at par. The stock for which they pay, is to be preferred stock, and is to pay a dividend of six *per cent.* before any dividend shall be paid upon other stock. How can it be said

that preferred stock with a pledge of six *per cent.* dividend, is not worth par? The Legislature has passed upon the fact, and the Court cannot controvert that finding. Suppose the Legislature had declared, that they found the fact to be, that the stock in the Rail Road was worth par; and that it would be an advantageous bargain on the part of the State, to give par value for the stock—could the fact be controverted by the Court? It is not pretended that it could be. Whether the stock is worth par or not, is not a question of law or of construction, but of fact. And it would be within the province of the Legislature to prescribe how that fact should be ascertained, or to ascertain it itself. Has not the Legislature plainly declared the fact, by directing that the stock shall be bought as preferred stock, and that the bonds shall be taken at par. But even if they are issued below par, still it makes no difference, because a special tax is provided for it the same Bill.

I conclude, therefore, (1) that under the first clause of the 5th section of the 5th article, the Legislature has unlimited power to contract new debts, provided par value is obtained for them, without laying any tax; and, (2) that it has unlimited power to contract new debts, even if its bonds are below par, provided it lay a tax in the same bill to pay the interest.

2. But it is said, that this case does not come under the first clause, which we have been considering, but under the second clause. We must consider it, therefore, with a view to that objection.

We have been considering the case, as if the purchase of the stock in the Rail Road were an ordinary debt contracted by the Legislature,—such as one to build a State capitol; or a a penitentiary. But is is objected, that it is not a debt in that sense, but a gift or loan of the credit of the State to a Rail Road, and comes under the second clause, which is, leaving out the exception, as follows:

" And the General Assembly shall have no power to give or lend the credit of the State, in aid of any person, association or corporation,   *   *   *   *   unless the subject be submitted to a vote of the people, " &c.

It is said, that the Act which we are considering, gives or lends the credit of the State to the Chatham Rail Road Co. If that be so, I admit that it is void. It would seem that it ought to be easy to ascertain whether the fact is so. The Act must speak for itself. If it says so, then it is clearly void; but when it does not say so, then it is valid; because it cannot be made to say so by implication, or inference, for, unless it is *plainly* void, then it is presumed to be valid—every inference and implication must be in favor of its validity, according to all authorities. The Act reads as follows:

" Whereas doubts have been raised as to the validity of bonds of the State, issued to and for certain Rail Road Companies, under Acts whose titles are hereinafter recited; and whereas it is the purpose of the General Assemby to place the validity of such bonds beyond question; now therefore, " &c.

The first section of the Act recites the title of Acts,—to amend the charter of the Williamston and Tarboro Rail Road Company, and of the Western North Carolina Rail Road Company, and ratifies and makes good the State bonds, which had been issued to those roads.

The second section provides, that, upon the surrender of those bonds, new bonds may be issued in their place, under this Act.

The third section lays a special tax to pay the interest.

Then follows the fourth section, which is the part of the Act which we are considering, and which seems to have been put in as an amendment; as it has no connection with the preamble, or with the other sections, and is as follows:

" Sec. 4. The public Treasurer is hereby ordered, whenever the President of the Chatham Rail Road Company shall certify, that the grading of the Road between Cheraw in South Carolina and the Gulf, or some other point on the Chatham Rail Road between Raleigh and the Gulf, has been let to contract, to subscribe to the capital stock of said Company $2,000,000 in behalf of the State, which subscription shall be paid by delivery to the President of said Company, of coupon bonds of the State at par, of the denomination of one

thousand dollars, dated October 1st, 1868, and payable thirty years thereafter, bearing six *per cent.* interest, payable semi-annually, &c.; provided, that said bonds shall only be issued on the surrender of a like amount of bonds of the State heretofore issued under an Act to amend the charter of the Chatham Rail Road Company, ratified the 15th of August, 1868. On which surrender, the same amount of bonds delivered by said company to the State, under the said Act, shall be cancelled. Said subscription shall be preferred stock, and pay a dividend of six *per cent.* before any dividend shall be declared on the other stock, &c."

The 5th section lays a special tax.

It will be seen that there is not one single word in the act, which by implication or inference even, can be construed into giving or lending the credit of the State to the Chatham Rail Road Co. It is a plain transaction of taking stock in the Road, and paying for it in the bonds of the State at par. The stock was to be taken just as an individual takes stock. And is it ever said when an individual takes stock in a Rail Road that he gives or lends his credit to the Road ? When a man goes into a store and buys goods and pays for them, either with cash or with his bond, does he give or lend his credit to the merchant ? But the character of the transaction and the purpose of the Legislature are not left in doubt, by reason of what had been done before. On the 15th of August, a few months before the passage of the act under consideration, the Legislature did, inadvertently, pass an act lending the credit of the State to the Chatham Rail Road Co., in express terms, without laying a tax, or submitting it to the people, and when, in December, the error was called to their attention, they substantially repealed that act. And for what purpose ? To commit the same error over again ? To lend the credit of the State again, when that was the error they were trying to cure ? That were folly indeed ! No. They called in the bonds issued under the August act, as a loan of the credit of the State, which they could not do; and bought stock in the Road, which they could do. And this was done avowedly to avoid the

12

constitutional obligation, and to preserve that instrument in its integrity. But now it is said, that they did the thing over again in December, which they had done in August and were trying to undo. And, although it is apparent that they are endeavoring to correct the error of the ` loan, and the act expressly calls it a *purchase of stock*, and although every implication, inference and presumption is to be allowed in favor of the validity of the act; yet, every implication, inference, presumption, and even express contradiction of the plain words of the act is allowed—to render it void.

The act of August was professedly a loan of the credit of the State. If the December act is also a loan of the credit of the State, in what does the last act differ from the first? And yet, the whole purpose of the last act was to change the transaction—the *loan* of August, into a *purchase* of stock. The difference in the August and December transactions further appears in this: when, under the August act, the Legislature loaned the credit of the State to the Company, it took no care as to the disposition of its bonds, because it was a matter of indifference to the State, at what price the Rail Road might sell its bonds, except as it affected the ability of the Company, as its debtor. But in December, when its bonds were to be issued for its own use, in the purchase of stock, it was provided, that they should be taken at par value, and for preferred stock. So far, therefore, from the State's lending its credit to the Company, it was driving what may be called a hard bargain against it; for the State certainly went in as a stock-holder upon better terms than the other stock-holders.

But then it is said, that although the Legislature directs that the bonds shall be paid out for stock at par, yet the *stock* is not worth par. How does that appear? How can it appear to us? Did not every other stock-holder pay par, in cash, for his stock? And is not the State's preferred stock, better than other stock? Is the Court, or is the Legislature, the judge of the value of the stock? If the Legislature contract to build a State capitol at $1,000,000, can we enjoin the payment, upon

the allegation that the house is not worth half the money?'
But I have already shown, that, whether the bonds were put
out at par or not, or whether the stock was worth much or
little, makes no difference; because a special tax was laid in
the same bill; and the sole question is, whether this was a pur-
chase of stock, as the act declares it to be, or was a *gift* or
*loan* of the *credit* of the State, as it was in the August act.

There was much discussion at the bar, as to the meaning of
the terms, *give* or *lend* the *credit* of the State, &c.   On one
side it was contended that a gratuity was indicated; on the
other, that the meaning was the same as, *bestow* or *allow* the
credit of the State, either with, or without consideration.   It
seems to me that the plain meaning is, that while the State
will use its own credit, or good standing, for its own benefit,
as in the first clause, yet it will not allow any body else to use
its credit, without asking leave of the people.   And is there
not great propriety in this?   Let me extend my former illus-
tration:   I authorize my agent to issue my bonds at par, to
get money for my own use; and then I can not be injured,
because I get as much as I will ever have to pay.   And so, in
cases of emergency, I authorize him to issue my bonds at any
price.   But then he enquires, " Suppose I am called upon for
charities, benevolences, liberalities, *gifts, loans*—how then?"
I answer, "I choose to reserve such things for my own dis-
cretion—consult me."

So with the State.   The Legislature, its agent, is authorized
to contract *debts* for ordinary and extraordinary purposes,
either with or without a tax, according to circumstances; but
when gift or loans of the credit of the State are asked for,
the Legislature, the agent, must consult the principal, the
people.

I do not enter into the consideration of any questions of
expediency, or policy.   Whether it be better to go in debt for
means to develope the resources of the State and to press on
to prosperity, as some say, or to avoid public outlays and
depend upon individual enterprise, as others say, are questions,

of great moment to the legislator and to the citizen, but they are not for the consideration of the Judge. I am of the opinion that the Act is valid.

SETTLE, J. I also am of the opinion that the Act in question is valid.

PER CURIAM.                     Judgment reversed.