BISCHOFFSHEIM *v.* BALTZER and another.

*(Circuit Court, S. D. New York. July 17, 1884.)*

1. SALE BY AGENT TO PRINCIPAL—WORTHLESS BONDS OF A STATE.

If an agent, in response to his principal's order to purchase for him certain bonds, purchases such from himself (he having received them in part payment on an individual contract for the delivery of iron) and charges his principal with them thus: "To bot. $100,000 6 per cent. North Carol. Bonds, $63,125,"—retaining them in his own possession and manifesting acts of ownership concerning them, in the event of the bonds being subsequently declared void by the highest court in North Carolina, the loss should fall on the agent, even though he had no intention to defraud.

2. SAME—PARTNERSHIP—CHOSE IN ACTION—SURVIVOR.

Upon the decease of one copartner, all the personal estate and assets of the firm, including debts and choses in action, survive to the partner still living.

3. SAME—CONFIDENCE—EQUITY.

When the relations of parties have been of peculiarly great personal confidence, it is proper to resort to equity in case of the discovery of an abuse of it. The propriety of the jurisdiction is as great when the account is opened for affording relief as it would be if the account had been left open.

In Equity.

*Joseph H. Choate,* for orator.

*Charles M. Da Costa,* for defendants.

WHEELER, J. The orator and Louis Raphael Bischoffsheim, since deceased, were merchants and bankers doing business in partnership in London. The defendants were partners doing like business in New York, and were confidential correspondents and agents of the orator's firm. The legislature of the state of North Carolina passed an act for the issue of bonds in aid of the Chatham Railroad Company in that state, against which the state was secured by mortgage of the road. The defendants and Schepeler & Co. furnished iron for the road, for which they were secured by deposit of state bonds in the Continental National Bank. The defendants were directed to buy $100,000 in amount of these bonds for the orator's firm, and they charged that firm in account current of their dealings, on November 21, 1868, with $63,125, the price of that amount of bonds, and reported a purchase at that price. These bonds have been adjudged by the highest court of the state to be wholly unconstitutional and void. *Galloway* v. *Jenkins,* 63 N. C. 147. The account, amounting to several millions, was adjusted with this item in it, and the bonds were left in the hands of the defendants for the orator's firm. In 1873 the defendants brought an action at law against the railroad company, whose name had been changed to the Raleigh & Augusta Air-line Railroad Company, to recover the price of the iron for the benefit of the orator and themselves, and failed, so far as is apparent, because their remedy, if any, was in equity; and in 1878 they brought a suit in equity to reach the property through the mortgage to the state of North Carolina, and in that suit they used the orator's bonds as their own, with other bonds of theirs, for the benefit of the orator with themselves, and they charged the orator with a part of the expenses of these suits, which were paid. Neither the orator's firm nor the orator, as survivor, was informed of the interest of the defendants in the bonds at any time until after the suit in equity was commenced by the defendants; but they supposed that the defendants had bought the bonds of others expressly for them, and had paid for the bonds the amount charged to them as the price of the bonds, and they do not appear to have before understood the precise ground of the infirmity of the bonds. This suit is brought by the orator, as survivor, to set aside the transaction, rectify the account, and recover the amount which would be due. It is resisted upon the ground that the remedy, if any, is at law and not in equity; that the next of kin or personal representatives of the deceased partner should have been made parties to the suit; and that the orator is not entitled to any recovery or relief.

It may be that the orator would have a remedy at law if entitled to relief here, but that is not decisive. The remedy there may not be so complete or convenient. Jurisdiction in equity is not understood as taken away by the statute, but as restrained merely within its usual limits. *Boyce's Ex'rs* v. *Grundy,* 6 Pet. 210; *Tayloe* v. *Merchants'*

*Ins. Co.* 9 How. 390; *Jones* v. *Bolles*, 9 Wall. 364. The bill states that the price of these bonds was charged in accounts. The accounts produced in evidence show large transactions by the defendants for the orator's firm in the sale of government bonds, gold, and stocks, at the time of this transaction, the proceeds of which are credited against this and other charges. If this item should be taken out, the whole account would be disturbed. There is not probably much doubt but that a bill in equity would lie for the adjustment of this account if it was open. 1 Story, Eq. § 462. The relation of the parties was one of peculiarly great personal confidence, such as is there mentioned as a reason for resorting to equity. The propriety of the jurisdiction is as great when the account is opened for affording relief as it would be if the account had been left open. The controversy may be narrowed to this item, but that does not alter the nature of the case involving the whole to reach the ultimate balance. *Brookman* v. *Rothschild*, 3 Sim. 153.

Upon the decease of the other partner all the personal estate and assets, including debts and choses in action, survived to the orator. This would carry to him all right to these bonds, and to the balance due on the account, if the purchase of the bonds should be rescinded. The right of the next of kin or personal representative would extend only to the share of the deceased in the ultimate balance. The right of election to rescind, as well as the right to pursue any other course to ascertain and collect the assets, would seem to belong to him and not to them. Colly. Partn. (Wood's Ed.) § 796, note.

In *Scholefield* v. *Heafield*, 7 Sim. 667, the real estate of the deceased partner appears to have been involved, which was a reason for joining the next of kin, and such separate rights appear to have been involved in some other cases. Here there is no separate right of the deceased partner. The whole belonged to the partnership, and the orator is invested with it.

What the interest of the defendants was in the bonds is the subject of some debate. Schepeler & Co. had or claimed to have some arrangement with an agent for the railroad company to furnish the iron. From the answer it appears that the defendants were to provide funds to pay for the iron, which they did. By the terms of the contract, under which the bonds were deposited in bank, on the presentation of a warehouse receipt or ship delivery order for any lot of the iron, a joint order was to be given for the delivery to defendants and Schepeler & Co. of so many of the bonds at the then market price as would equal the sum payable for the iron. The defendants presented receipts or orders for a lot of the iron, and received a joint order for 250 bonds, of $1,000 each, the delivery of which to them they acknowledged November 11, 1868, to sell at market price to pay for their deliveries of the iron. No interest of Schepeler & Co. in the bonds appears or is claimed. The iron amounted to $167,098.73; the bonds, at market price, to somewhat less. Their interest, therefore, was that of pledgees

for sale, but to an amount equal to the value of the bonds, and they were substantially owners of the bonds.

The extent to which they acted on their own discretion as agents, or under the direction of the orator's firm as principals, is also somewhat questioned. Several communications had passed about these bonds, and the price and time of payment. The defendants sent information that the price would be about 65 per cent. for $100,000, cash, and asked if they should buy at any time before revocation, and send the bonds. They were answered affirmatively, but not to send the bonds. This direction was kept in force; the officers and agents of the railroad company agreed to a sale at $64\frac{1}{2}$ per cent. A purchase at that price was reported, the charge made for the price, and the bonds kept, the difference in amount being an equalization of interest.

The orator's firm did not so direct as to leave the defendants without agency in the transaction of the business. They understood, and had the right to understand, that the defendants were acting for them without any adverse interest. The defendants were in reality sellers, while they assumed to act for the purchasers. Their charge was, "To bot. $100,000 6 % North Carol. Bonds, $63,125." This was a charge as for money paid for the orator's firm to purchase the bonds, instead of, as the fact was, for bonds sold to the orator's firm. The bonds were not poor from the insolvency of the state of North Carolina; they were the result of unconstitutional legislation,—not the bond or obligation of the state at all, nor recognized as such by any department of the state. The defendants did not know that the bonds were void. They supposed them to be good, and were not blamable for not knowing that they were bad. They were declared void by a divided court. but the proceeding in which the decision was made directly affected the bonds, and was as fatal to them as the most glaring defect. This result became known in North Carolina and New York soon after this transaction.

The orator's firm did not get what was bought. They bought bonds as binding obligations of the state; what they got contained no obligation, and were not bonds of the state. They were like counterfeit notes or bills; the supposed maker was not holden. The subject of the sale did not exist, and there could be no valid and binding sale. This is elementary. 2 Kent, Comm. 468. Had the orator's firm known that the defendants were the sellers, and learned that the bonds were void when the defendants did, there seems to be no doubt but that the transaction might then have been repudiated by them. But as they were left by the defendants to suppose the transaction was, there was no way open to them for avoiding it as to the defendants. As the transaction in fact was, a charge of the bonds as sold would have failed; as the transaction was left to appear to them, the charge for money paid for the bonds would be valid. Further, had these bonds been all that they were supposed to be, the defendants could not

act for themselves as sellers, and for the orator's firm as purchasers, and make a valid sale of them. The attempted contract of sale would fail for want of parties to it, unless something should take place afterwards to make it good. This, also, is elementary. Story, Ag. § 211. There never has been any delivery of the bonds, nor anything done with them to confirm any contract. They have always remained with the defendants, and whatever has been done about them has been done by the defendants in their own names. Neither the orator nor his deceased partner has ever ratified the purchase as a purchase from the defendants; for the deceased partner, so far as has been shown, never knew of it, and when the orator became informed of it, he repudiated it. The rights of the parties appear to be the same now as at first.

The rights of the defendants growing out of the character of the bonds have all been preserved, apparently, by their own vigilance. It has been urged that they might have held on to the iron if the purchase of the bonds had been repudiated immediately, and that, therefore, they cannot now be placed as before. But the orator's firm had nothing to do with the iron. That had relation to their obtaining and not to their disposing of the bonds. Had they given notice of the transaction as it was, and that they wished to follow the iron unless the sale was approved, it might have been different in this respect; but nothing of this kind was done. The *status quo*, as between these parties, relates only to the bonds, and to the charge for the money paid for them. That is easily regained.

The question here is not whether the defendants undertook to palm off worthless bonds,—they doubtless understood that they were rendering the money's full worth,—but where this loss should fall. By the law, as here understood, as applied to the facts as they are made to appear, it should fall upon the defendants.

Let there be a decree setting aside the sale, and for a resettlement of the accounts, with costs.