BOARD OF COM'RS OF STANLY COUNTY et al. v. COLER et al.

(Circuit Court of Appeals, Fourth Circuit. February 4, 1902.) ·

No. 290.

1. FEDERAL COURTS—FOLLOWING STATE DECISIONS—CONSTRUCTION OF STATUTES.

A decision of the supreme court of a state construing a valid statute, and holding invalid bonds of a county which had been previously issued thereunder and placed in the market, and had been sold to bona fide purchasers, where none of the bondholders were parties to the action, is not binding on a federal court in an action subsequently brought by bondholders against the county, but it is the duty of such court to determine the question independently.[1]

2. COUNTIES—POWER TO AID RAILROADS—NORTH CAROLINA STATUTE.

Code N. C. 1883, § 1996, first enacted in 1869, and re-enacted in the Code in 1883, provides that "the boards of commissioners of the several counties shall have power to subscribe stock to any railroad company or companies when necessary to aid in the completion of any railroad in which the citizens of the county may have an interest." The succeeding sections require the submission of the question of the proposed subscription to the voters of the county. The constitution of 1868 (article 5, § 4) expressly provides that the state shall give aid to railroads only when authorized by a direct vote of the people, or "to aid in the completion of such railroads as may be unfinished at the time of the adoption of this constitution, or in which the state has a direct pecuniary interest." Held, that in view of the difference in the language of the two provisions, as well as of the plain and ordinary meaning of the words of the statute relating to counties, it could not be construed as limited in application to cases where railroads had been commenced and were unfinished at the time the constitution was adopted, and in which the counties, as such, had a direct pecuniary interest, but that it conferred power on counties to subscribe for stock, in the manner prescribed, in any railroad company which had been duly incorporated to build a projected road in which the citizens of the county, as a body, have a general interest because of the supposed benefits to be derived from it.

3. SAME—VALIDITY OF BONDS—EFFECT OF RECITALS.

Where a county issued negotiable bonds, as authorized by such statute, in payment for stock subscribed in a railroad company which built its road into the county as agreed, and the county received and continued to hold the stock, taxed the road, and for a number of years paid the interest on the bonds, it is estopped by recitals therein that they were issued by authority of such statute, as against a bona fide holder for value, to deny that the subscription was necessary to aid in the completion of the road, or that the citizens of the county had an interest therein, both of which were facts precedent to the right to exercise the power conferred by the statute.

Goff, Circuit Judge, dissenting.

On Rehearing. For former opinion, see 37 C. C. A. 484, and 96 Fed. 284.

A. C. Avery and James E. Shepherd (Avery & Avery, Schenck & Schenck, and Shepherd & Busbee, on the briefs), for appellants.

Charles Price (John F. Dillon and Harry Hubbard, on the briefs), for appellees.

[1] State laws as rules of decision in federal courts, see notes to Griffin v. Wheel Co., 9 C. C. A. 548; Wilson v. Perrin, 11 C. C. A. 71; Hill v. Hite, 29 C. C. A. 553.

113 F.—45

Before GOFF, Circuit Judge, and MORRIS and BOYD, District Judges.

MORRIS, District Judge. The opinion expressing the conclusions of this court on the first hearing of this case was filed August 1, 1899. 37 C. C. A. 484, 96 Fed. 284. Upon the appellees' petition for a rehearing the whole case has been fully reargued in connection with the appeal in Wilkes Co. v. Coler, decided at this term, 113 Fed. 725, and in connection with the answers of the supreme court of the United States to the questions certified in that case. 180 U. S. 506, 21 Sup. Ct. 458, 45 L. Ed. 642.

The bonds in question are as follows:

### "County of Stanly Six Per Cent. Bond.

"Stanly county, state of North Carolina, is indebted to the bearer in the sum of five hundred dollars payable, * * *" etc. "This bond is one of a series of eighty of the denomination of one thousand dollars each, and forty of the denomination of five hundred, making a total of one hundred thousand dollars, issued by authority of an act of the general assembly of North Carolina ratified the third day of March, A. D. 1887, entitled 'An act to amend the charter of the Yadkin Railroad Company,' and of sections 1996, 1997, 1998, and 1999 of the Code of North Carolina, and authorized by a majority of the qualified voters of Stanly county at an election regularly held for that purpose on the 15th day of August, A. D. 1889, duly ordered by the commissioners of Stanly county. This series of bonds is issued to pay the subscription of one hundred thousand dollars made by Stanly county to the capital stock of the said railroad, known as the Yadkin Railroad Company. * * *" etc. "In testimony whereof, the chairman of the board of county commissioners of Stanly county hath hereunto subscribed his name for and on behalf of said board, and the clerk of the superior court of Stanly county hath countersigned the same and affixed thereto the seal of said superior court this fourth day of July, A. D. 1890."

The recitals of present interest are (1) that the bonds are issued by authority of the act of March 3, 1887; and (2) of sections 1996, 1997, 1998, and 1999 of the Code; and (3) are authorized by a majority of the votes of the county.

The act of March 3, 1887, the supreme court of North Carolina has decided, never became a law of North Carolina, so far as it undertook to give authority to issue the county bonds, for the reason that it was not passed with the special formality required by section 14 of article 2 of the North Carolina constitution of 1868, which declares that no law shall pass, authorizing a county to raise money on its credit, or impose a tax, unless the bill be read three several times in each house of the general assembly, and pass three several readings on different days, and the yeas and nays on the second and third reading of the bill are entered on the journals. The recital of the invalid enactment of March 3, 1887, however, does not invalidate the bonds, if there was in force at the time the bonds were issued other valid legislation which gave power to Stanly county to issue them; and it is urged upon us by counsel for the bondholders that the recited sections of the Code, reasonably construed, and applied as understood at the time the bonds were issued, gave sufficient power and authority. County Com'rs v. Beal, 113 U. S. 227, 5 Sup. Ct. 433, 28 L. Ed. 966; Commissioners v. January, 94 U. S. 202, 24 L. Ed. 110; City of Evansville v. Den-

nett, 161 U. S. 434, 443, 444, 16 Sup. Ct. 613, 40 L. Ed. 760; Knox Co. v. Ninth Nat. Bank, 147 U. S. 91, 13 Sup. Ct. 267, 37 L. Ed. 93; Wilkes Co. v. Coler, 180 U. S. 506–524, 21 Sup. Ct. 458, 45 L. Ed. 642. These sections of the Code were originally enacted as chapter 171 of the laws of North Carolina of 1868–69, and were re-enacted as sections 1996, 1997, 1998, 1999, and 2000 of the Code of 1883, with all the formality required by section 14 of article 2 of the constitution with regard to a law allowing counties to pledge their credit and impose a tax for that purpose. Commissioners v. Snuggs, 121 N. C. 394–401, 28 S. E. 539, 39 L. R. A. 439.

The following are sections 1996 and 1997:

Section 1996 of the Code of North Carolina: "The boards of commissioners of the several counties shall have power to subscribe stock to any railroad company or companies when necessary to aid in the completion of any railroad in which the citizens of the county may have an interest."

Section 1997 of the Code of North Carolina: "The board of commissioners of any county proposing to take stock in any railroad company shall meet and agree upon the amount to be subscribed, and, if a majority of the board shall vote for the proposition, this shall be entered upon the record, which shall show the amount proposed to be subscribed, to what company, and whether in bonds, money or other property, and thereupon the board shall order an election, to be held on a notice of not less than thirty days, for the purpose of voting for or against the proposition to subscribe the amount of stock agreed on by the board of county commissioners. And, if a majority of the qualified voters of the county shall vote in favor of the proposition, the board of county commissioners, through their chairman, shall have power to subscribe the amount of stock proposed by them and submitted to the people, subject to all the rules, regulations and restrictions of other stockholders in such company or companies. Provided, that the counties, in the manner aforesaid, shall subscribe from time to time such amounts, either in bonds or money, as they may think proper."

The bonds were duly authorized by a majority of the qualified voters of Stanly county, and were dated July ———, 1890, and were issued from time to time as the railroad was built, and were placed on the market and sold; and for four years a tax was levied and collected by the county, and the interest coupons paid. When the tax for the fifth year had been collected, the superior court of Stanly county, in 1897, at the instance of the commissioners of the county and certain taxpayers, held the bonds to be invalid, and enjoined the treasurer of the county from paying the interest; and on appeal the supreme court of North Carolina affirmed the ruling. Commissioners v. Snuggs (1897) 121 N. C. 394, 28 S. E. 539, 39 L. R. A. 439. The supreme court of North Carolina (Chief Justice Faircloth dissenting) held that Stanly county had no power or authority, under the above-recited sections of the Code, even with an affirmative vote of the qualified voters of the county, to issue bonds, and levy a tax for their payment, in aid of a railroad not begun before the adoption of the state constitution of 1868.

When this case was first heard in this court the argument of the counsel for the bondholders was largely devoted to the effort to show that the decision of the supreme court of North Carolina against the validity of the act of March 3, 1887, amending the charter of the Yadkin Railroad Company, and authorizing Stanly county to subscribe for its stock and issue these bonds, and declaring that act invalid

because not passed as required by the state constitution, was a ruling which this court ought not to follow. That question has been settled in favor of the county by the supreme court of the United States. Wilkes Co. v. Coler, 180 U. S. 506, 21 Sup. Ct. 458, 45 L. Ed. 642. The other question,—how far this court was bound to follow the rulings of the supreme court of North Carolina in its construction of the sections of the Code recited in the bonds, was not fully discussed, and this is the question we are urged to re-examine upon this rehearing.

The articles of the Code, first enacted in 1868–69 (chapter 171), and re-enacted as part of the Code in 1883, before the Stanly county bonds were authorized or issued, does, in the broadest terms, by section 1996, declare that "the boards of commissioners of the several counties shall have power to subscribe stock to any railroad company when necessary to aid in the completion of any railroad in which the citizens of the county may have an interest." The supreme court of North Carolina declared in Commissioners v. Snuggs (1897) that this language was to be held to mean that the railroad must be an unfinished one, which had been begun before the subscription was made, and that it must also be a railroad in which the county had a direct pecuniary interest. The question now to be re-examined is whether that construction is one to which, as a proposition of law, we can assent; and, if not, are we bound to follow the decision of the supreme court of North Carolina?

The case of Commissioners v. Snuggs was not a case to which any bondholder was a party. The county commissioners and certain taxpayers of the county were the plaintiffs, and the defendant was the county treasurer, who was the appointee of the county commissioners, had no personal interest to resist the plaintiffs, and represented no bondholder. The bonds had been sold as negotiable securities, and had been over four years on the market, and had been purchased by widely scattered investors. The railroad into Stanly county had been built and was in operation, and for over four years the authorities of the county had recognized the bonds as valid obligations of the county, and had paid the interest. The case was, in effect, a direct attack upon the property of bona fide holders of the bonds, in which they had no hearing. It seems, therefore, to be a case in which it is our duty to examine the question independently, with, however, an earnest disposition to lean towards the conclusion arrived at by the supreme court of North Carolina. Folsom v. Township Ninety-Six, 159 U. S. 611, 627, 16 Sup. Ct. 174, 40 L. Ed. 278; Burgess v. Seligman, 107 U. S. 20, 33, 34, 2 Sup. Ct. 10, 27 L. Ed. 359; Loeb v. Columbia Tp., 179 U. S. 472–493, 21 Sup. Ct. 174, 45 L. Ed. 280.

Was there anything in the constitution, laws, or decisions of North Carolina which should have given warning to purchasers of the bonds that the power given to counties by section 1996 of the Code was not applicable to the Yadkin Railroad Company in Stanly county? As to state aid, the constitution clearly said (article 5, § 4) that it should only be given, unless submitted to a direct vote of the people of the state, "to aid in the completion of such railroads as may be unfinished at the time of the adoption of this constitution, or in which the state has a direct pecuniary interest." The language used by the framers of the

constitution when dealing with the aid which might be given, not by the state, but, by counties, to railroads, is quite different, and it was to be presumed that the difference in language was significant of a corresponding difference in meaning, intention, and policy. With regard to counties, the language of the constitution is simply (article 7, § 7) that no county shall loan its credit, nor shall any tax be levied, except for necessary expenses thereof, unless by a vote of the qualified voters therein. With regard to section 1996 of the Code, there had not been, prior to the issuing of the bonds in suit, any decision of the supreme court of North Carolina construing its meaning. The import of its words, "The boards of commissioners of the several counties shall have power to subscribe stock to any railroad company or companies when necessary to aid in the completion of any railroad in which the citizens of the county may have an interest," was to be understood by those whose rights might be affected by them in their natural, ordinary, generally received sense. In the first place, there is nothing in the words or their context to indicate that when enacted in the Code, in 1883, they were not intended to be a guide for the future, and not for the past. The office of laws is to operate upon future actions, and the universal rule is that statutes are prospective in their operation, unless the statute itself declares it to be retrospective. It would seem, therefore, that while the Code remained unaltered whenever the case arose in which the citizens of a county might have an interest in a railroad, and county aid was necessary to its completion, section 1996 gave power to the board of commissioners to subscribe to its stock. James v. City of Milwaukee, 16 Wall. 159, 21 L. Ed. 267. Then follows section 1997, which prescribes how the board of commissioners shall by vote determine the amount, and whether the subscriptions shall be in bonds, money, or property, and how they shall, when they have so determined, submit the proposition to a vote of the people, and reiterates the provision that "the counties, in the manner aforesaid, shall subscribe from time to time such amounts, either in bonds or money, as they may think proper." Section 1998 provides how the election shall be had. Section 1999 declares that in case the county shall subscribe the amount proposed, in bonds, the county commissioners shall have power to fix the rate of interest, and when and where it shall be payable, and to raise by taxation from year to year the amount necessary to meet the interest on said bonds. Section 2000 provides that the taxes to be raised for the payment of interest and principal shall be collected in like manner as other state taxes, and paid into the hands of the county treasurer, to be used by the chairman of the board of county commissioners "as directed by this chapter." It would seem that the fair import of this valid legislation would be to give to the county commissioners of Stanly county power to do the very thing they have done in issuing these bonds. It is true that the supreme court of North Carolina has decided to the contrary, and has invalidated the bonds by its decision in 1897 in Commissioners v. Snuggs; but that was a case instituted five years after the bonds were put on the market, and in which the bondholders were not parties or represented. The supreme court of North Carolina was led to the conclusion that, when

the act of 1868–69 was re-enacted in the Code, section 1996 and the four succeeding sections, could have had reference to no case except where the county had a direct pecuniary interest in a railroad which had been begun and was unfinished at the time of the adoption of the constitution, in 1868, and could not apply to the Yadkin Railroad, which was begun in 1889. With this conclusion, after the most careful consideration, and having now heard the matter reargued, a majority of the judges composing this court are unable to agree. The framers of the constitution of the state, when intending to express such restriction, used such entirely different language that it is difficult to suppose that the legislature in 1868–69 and in 1883, with that language in the state constitution, intended the same thing when they used the language now found in the Code.

The words "in which the citizens of the county may have an interest" would seem to be the appropriate words to express the general interest which the whole body of the people of a county have in a railroad which they believe will benefit them, as distinguished from a direct pecuniary interest of the county as a corporation. When the framers of the constitution intended to limit and restrict the state in lending its credit to railroads, they said, "except to aid in the completion of such railroads as may be unfinished at the time of the adoption of this constitution, or in which the state has a direct pecuniary interest, unless by a direct vote of a majority of the people of the state who should vote thereon." How natural and to be expected it would be that, if the legislature had intended to restrict county aid to the same class of railroads, they would have used somewhat similar language! Finding that section 1996 gives power to the county to subscribe to stock in any railroad "when necessary to aid in the completion of any railroad in which the citizens of the county may have an interest," is it not reasonable to read it as meaning to complete the raising of the money necessary to build the road? When the route is surveyed and determined upon, and the charter for a private corporation obtained, and part of the stock subscribed, but not sufficient to complete the road, is it not most natural, with regard to such a projected road, that the authority to the county to subscribe stock should be spoken of as aiding in the completion of the road? To complete a projected railroad for which a charter has been obtained, and for constructing which part of the stock has been subscribed, the thing needed is more subscriptions of stock. And when the subject in hand is aiding in the completion of the road by subscription of stock, those aid in its completion who make the additional subscriptions to the stock. The language of Mr. Justice Brewer in Town of Andes v. Ely, 158 U. S. 312–321, 15 Sup. Ct. 954, 39 L. Ed. 996, is pertinent:

"While courts may properly see to it that proceedings for casting burdens upon a community comply with all the substantial requirements of a statute, in order that no burden may be recklessly or fraudulently imposed, yet such statutes are not of a criminal character, and proceedings are not to be so technically construed or limited as to make them a snare to those who are encouraged to invest in the securities of the municipality."

Cited, also, in Provident Life & Trust Co. v. Mercer Co., 170 U. S. 593–600, 18 Sup. Ct. 788, 42 L. Ed. 1156.

In the resolution adopted by the board of county commissioners in June, 1889, ordering an election to be held in Stanly county to ascertain whether a majority of the voters favored the subscription, it was stated, "It appearing that the citizens of said county have an interest in said railroad," and it was provided:

"If the proposition to vote said subscription shall be ratified by a majority of the qualified voters of said county at said election, then said bonds shall be delivered to said Yadkin Railroad Company as follows: Twenty-five thousand dollars when ten miles of said road is constructed and in operation from Rowan county line into said county of Stanly, twenty-five thousand when said road is constructed and in operation from the town of Salisbury to the town of Albemarle, and the remaining fifty thousand dollars when said road is constructed and in operation from the town of Salisbury to the village of Norwood, in Stanly county: provided, that the said railroad company shall be required to begin the construction of said road at Salisbury within ninety days from and after the first day of October, 1889, and to complete the same to Norwood within 18 months thereafter, and, if not so begun and completed, then said bonds shall not be delivered to said company: provided, however, that the board of commissioners of Stanly county shall have full power and discretion to extend the time for the performance of the conditions and limitations hereinbefore mentioned."

Thus it would seem that the board of commissioners and the voters of the county, a majority of whom voted in favor of this proposition, understood very intelligently what was meant by aiding in the completion of a railroad in which the citizens of the county might have an interest. The meaning given to the language of the Code after the rights of the holders of the bonds had vested is too strained, unnatural, and unwarranted to be accepted, to the destruction of property rights acquired in good faith, based upon the ordinary meaning of the language. Reluctant as we have been, in deference to the opinion announced in Commissioners v. Snuggs, to come to this conclusion, we think there is no escape from it. Moreover, is not the legal effect of the recital in the bonds stating that they were issued by authority of sections 1996, 1997, 1998, and 1999 of the Code of North Carolina equivalent to a statement that the facts existed which authorized their issue under those sections, viz., that they were issued to aid in the completion of a railroad in which the citizens of the county had an interest, and is not the county now estopped from denying that recital? It seems to us that many cases have so held. Chaffee Co. v. Potter, 142 U. S. 355, 364, 12 Sup. Ct. 216, 35 L. Ed. 1040; City of Evansville v. Dennett, 161 U. S. 434–442, 16 Sup. Ct. 613, 40 L. Ed. 760; Board of Com'rs v. National Life Ins. Co., 32 C. C. A. 591, 90 Fed. 230, 231; Hughes Co. v. Livingston, 43 C. C. A. 541, 104 Fed. 306–316; School Dist. v. Rew (C. C. A.) 111 Fed. 1, 7, 8; Belo v. Commissioners, 76 N. C. 489, 493, 494, 495.

It is urged in behalf of the county that legislation substantially the same, in terms, as sections 1996 to 2000 of the Code, had been held to be unconstitutional in 1885 by the supreme court of North Carolina in Barksdale v. Commissioners (1885) 93 N. C. 472. In that case the question was as to the legality of the tax assessed by the county for the support of schools under a general law giving power to all counties. The objection made was that the tax was in

excess of the limit prescribed by the constitution, and that the act allowing the commissioners to exceed the limit was unconstitutional, because in disregard of article 5, § 1. The tax in that case was levied without being submitted to a vote of the people of the county, and was therefore inhibited by section 7, article 7, of the constitution. The further objection also prevailed that the tax about to be levied exceeded the limit restriction of section 6 of article 5, viz:

"The taxes levied by commissioners of the several counties shall be levied in like manner with the state taxes, and shall never exceed the double of the state tax, except for a special purpose and with the special approval of the general assembly."

There is no allegation or evidence in this case that the payment of interest on these bonds requires a tax exceeding that limit, or that the tax collected and in the hands of the county treasurer, levied for the purpose of paying the coupons due at the institution of this suit, had exceeded that limit.

The case of Galloway v. Jenkins (1869) 63 N. C. 147, cited by counsel for the county, deals exclusively with the constitutional provision restricting the state from aiding railroads without a vote of the people, and has no relevancy to cases of county subscriptions. We find nothing in the decisions of the supreme court of North Carolina prior to the issue of these Stanly county bonds that pointed to any defect of power to issue them under the Code sections recited in the bonds. On the contrary, the opinion of that court in Belo v. Commissioners (1877) 76 N. C. 494, 495, is to the effect that as to bona fide holders the records of the proceedings of the commissioners affirming the existence of particular facts are conclusive, as well as the recitals in the bonds that they have been issued in pursuance of the law which authorized their issue.

The majority of the judges constituting the court on this rehearing are of opinion that the decree of the circuit court should be affirmed.

BOYD, District Judge. I concur with Judge MORRIS in his opinion filed in this case, and will give my reasons therefor:

The county of Stanly issued its bonds, in the sum of $100,000, in the years 1890, 1891, etc., for the purpose of paying its subscription to the stock of the Yadkin Railroad, running from Salisbury to a point in Stanly (Norwood),—a distance of 44 miles. It is alleged in the bill that this road runs through the best and most fertile portion of Stanly county for a distance of 30 miles. It is also alleged that the county of Stanly "has received benefits from the same, in the greatly increased value of the lands of the county, in the increased and improved transportation within the limits of the same, and, further, by reason of the taxes paid into the treasury of the county by the company in each and every year." It is also alleged "that in return for, and in consideration of, said subscription, the Yadkin Railroad Company issued to said county of Stanly stock in and to the said amount of one hundred thousand dollars, which stock the county holds now, and has held since the date of the issue of the same, to wit, the year 1891." It appears, also, that the interest on the bonds so issued

by the county of Stanly was paid regularly to complainants and others holding the bonds until 1897,—some time before the commencement of this suit. It is alleged in the bill that complainants "bought, for valuable consideration, a large sum (the market price), a great number" of these bonds (48), of the denomination of $1,000 each; "that the purchase of the bonds was for value, in good faith, and without any notice, expressed or implied, that there was any suggestion of their being void, invalid, or fraudulent, or otherwise than perfectly legal in their issue and sale." It appears that the payment of the interest on these bonds was stopped by reason of a judgment of the superior court of Stanly county, affirmed by the supreme court of North Carolina, in 1897, in the case of Commissioners v. Snuggs, 121 N. C. 394, 401, 28 S. E. 539, 39 L. R. A. 439. In that action the bonds in question were adjudged void. It is to be noted, in the first place, that there was no bondholder party to the suit of Commissioners v. Snuggs; it being an action brought against the defendant, Snuggs, to restrain him from paying the interest on the bonds to the holders of the same; the interest, in the amount of $6,000, being in his hands, as treasurer, having been paid to him by the sheriff of the county for that purpose, and only that. It was held by him—set apart from all other funds—solely for the purpose of the payment of the interest due July 1, 1897.

The contention upon the part of the defendants, as appears from the complaint filed in May, 1897, in the superior court of Stanly, in the action against Snuggs, in which they were plaintiffs, was that the bonds sued on here were void because the acts of 1870 and 1887 were not passed in accordance with the requirements of section 14, art. 2, "of the constitution of North Carolina, in that neither of the said acts passed its several readings in the house of representatives, on three different days," and that the yeas and nays, if taken at all, were not entered upon the journal, as required, etc. In this contention the plaintiffs in this action in the state court were sustained. In the supreme court, however, it was insisted that, in addition to the power conferred by the statutes to issue the bonds, it was also conferred by sections 1996, 1997, 1998, and 1999 of the Code of North Carolina, recited in the body of the bond. The court, as appears from the opinion of Justice Montgomery, failed to uphold this contention, also, upon the sole ground, however, that the road was not shown to be an "unfinished road," and that the "citizens of the county had an interest in the same."

Section 1996 of the Code of North Carolina is as follows:

"The board of commissioners of the several counties shall have power to subscribe stock to any railroad company, or companies, when necessary to aid in the completion of any railroad in which the citizens of the county may have an interest."

In the case of Commissioners v. Snuggs the sections of the Code were upheld by the court as valid statutes, and in this case were for the first time construed by the supreme court of North Carolina. They were passed regularly, and in accordance with the requirements of the constitution of the state. The court put its decision upon the ground that the sections of the Code did not apply. It was a con-

struction of a valid statute by the court six years after the bonds in question came into the hands of complainants, innocent purchasers for value. In the case of Wilkes Co. v. Coler, 180 U. S. 506, 21 Sup. Ct. 458, 45 L. Ed. 642, it was decided that the decisions of the highest court of a state upon the question whether a particular act was passed in such manner as to become, under the state constitution, a law, should be accepted and followed by the federal courts. This decision was rendered in a case certified to the supreme court from this court,— Wilkes Co. v. Coler; one of the cases in which Judge MORRIS has filed the opinions suggested in the outset of this argument, and of a similar nature to this.

The question, then, is, in the case under consideration, whether the bonds are valid and legal bonds. It was contended in the argument that this court is bound by the decisions of the state court in the case of Commissioners v. Snuggs, 121 N. C. 394, 28 S. E. 539, 39 L. R. A. 439. I think not, and, however much we may regret it,—and we do regret it,—it is still our duty to decide this case in accordance with the principles, as we understand them, laid down by the supreme court of the United States and by this court. In Burgess v. Seligman (the leading case upon this subject), the supreme court of the United States (Justice Bradley delivering the opinion of the court) says:

"Where contracts and transactions have been entered into, and rights have accrued thereon, under a particular state of the decisions, or where there has been no decision of the state tribunals, the federal courts properly claim the right to adopt their own interpretation of the law applicable to the case, although a different interpretation may be adopted by the state courts after such rights were accrued."

Says Justice Bradley further:

"Federal courts exercise their own judgment always in reference to the doctrines of commercial law."

The rights of these parties here are to be determined according to the doctrines of commercial law; it being well settled that the bonds in question are commercial securities,—negotiable instruments.

Pine Grove Tp. v. Talcott, 19 Wall. 666, 667, 22 L. Ed. 227, was an action in the United States circuit court upon coupons cut from bonds issued by that township in aid of a railroad under an act of the general assembly of Michigan. The plaintiff in error insisted that several decisions of the supreme court of the state holding that the construction of railroads was not a public corporate purpose, such as townships were authorized by the constitution of Michigan to aid, and that such statute and the bonds issued in pursuance of it were void, were controlling. The supreme court of the United States, in declining to be bound by those decisions, said:

"It is insisted that the invalidity of the statute has been determined by the two judgments of the supreme court of Michigan, and that we are bound to follow those adjudications. We have examined those cases with care. With all respect for the eminent tribunal by which the judgments were pronounced, we must be permitted to say that they are not satisfactory to our minds. We think the dissenting opinion in the one first decided is unanswered. Similar laws have been passed in twenty-one states. In all of them but two it is believed their validity has been sustained by the highest local courts. It is not easy to resist the force of such a current of

reason and authority. The question before us belongs to the domain of general jurisprudence. In this class of cases this court is not bound by the judgment of the courts of the states where the cases arise. It must hear and determine for itself. Here commercial securities are involved. When the bonds were issued there had been no authoritative intimation from any quarter that such statutes were invalid. The legislature affirmed their validity in every act by an implication equivalent in effect to an express declaration. And during the period covered by their enactment neither of the other departments of the government of the state lifted its voice against them. The acquiescence was universal. The general understanding of the legal profession throughout the country is believed to have been that they were valid. The national constitution forbids the states to pass laws impairing the obligation of contracts. In cases properly brought before us, that end can be accomplished unwarrantably no more by judicial decisions than by legislation. Were we to yield in cases like this to the authority of the decisions of the courts of the respective states, we should abdicate the performance of one of the most important duties with which this tribunal is charged, and disappoint the wise and salutary policy of the framers of the constitution in providing for the creation of an independent federal judiciary. The exercise of our appellate jurisdiction would be but a solemn mockery."

Justice Harlan, in Wilkes Co. v. Coler, 180 U. S. 506, 21 Sup. Ct. 458, 45 L. Ed. 642, before referred to, shows that it is only in cases where the state court has held an enactment is not passed in accordance with the requirements of the constitution that its decision is controlling.

Here is a construction of a valid statute, recited in the bond, which this court is asked to follow. We are not bound by it, and, while we regret it in this case, we cannot follow it. Says Justice Harlan, in Wilkes Co. v. Coler (page 519, 180 U. S., and page 463, 21 Sup. Ct., and 45 L. Ed. 642):

"Observe that the issue is not as to the construction, meaning, or scope of a statute, but whether that which purports to be a legislative enactment ever became a law for any purpose."

This paragraph from the opinion of Justice Harlan draws the distinction clearly and expressly between "the issue as to the construction, meaning, and scope of a statute," and the issue as to "whether that which purports to be a legislative enactment ever became a law for any purpose." The court holds that the decisions of the highest court of the state upon the question as to whether "an enactment in the form of a statute was ever passed, so as to become, under the state constitution, a law," or not, are not to be disregarded. The question here is not whether the sections of the Code relied on were ever passed as required by the constitution, so as to become valid laws (statutes of the state), but whether the circuit court of the United States is bound by the "construction, meaning, and scope of a statute" passed as required by the constitution, placed upon such statute by the highest court of a state after the issue of the bonds, which holds invalid and void bonds (negotiable instruments, commercial securities) issued by Stanly county "in good faith, put upon the market in due course of trade, purchased in open market for value"; the purchaser being unaware of any defect of authority or other irregularity on the part of the county, and there being nothing to excite suspicion of any defect or irregularity.

In the leading case of Louisville, N. A. & C. R. Co. v. Louisville Trust Co., 174 U. S. 573, 574, 19 Sup. Ct. 825, 43 L. Ed. 1081, Justice Gray says:

"In Merchants' Bank v. State Bank, 10 Wall. 604, 19 L. Ed. 1008, this court stated, as an axiomatic principle in the law of corporations, this proposition: 'Where a party deals with a corporation in good faith, the transaction is not ultra vires, and he is unaware of any defect of authority or any other irregularity on the part of those acting for the corporation, and there is nothing to excite suspicion. of such defect or irregularity, the corporation is bound by the contract, although such defect or irregularity in fact exists. If the contract can be valid under any circumstances, an innocent party in such a case has a right to presume their existence, and the corporation is estopped to deny them.' 10 Wall. 644, 645; Board v. Sutliff, 38 C. C. A. 167, 97 Fed. 270. The proposition was supported by citations of many English and American cases, and among them Bank v. Turquand (1856) 6 El. & Bl. 327; and the justices of this court, while differing among themselves in the application of the principle to municipal bonds, have always treated Bank v. Turquand as well decided upon its facts. Knox Co. v. Aspinwall, 21 How. 539, 545, 16 L. Ed. 208; Moran v. Miami Co., 2 Black, 722, 724, 17 L. Ed. 342; Gelpcke v. City of Dubuque, 1 Wall. 175, 203, 17 L. Ed. 520; St. Joseph Tp. v. Rogers, 16 Wall. 644, 666, 21 L. Ed. 328; Humboldt Tp. v. Long, 92 U. S. 642, 650, 23 L. Ed. 752. And see Zabriskie v. Railroad Co., 23 How. 381, 16 L. Ed. 488, above cited."

The cases cited by Justice Gray in the above paragraph are decided upon municipal bonds, and show that the principle he states applies to contracts municipal as well as to other corporations; and the late Justice Miller, in his dissenting opinion in the case of Humboldt Tp. v. Long, 92 U. S. 650, 651, 23 L. Ed. 752, says:

"The case of Knox Co. v. Aspinwall, 21 How. 539, 16 L. Ed. 208, the original case, on which the rule and principles are based, is itself based upon Bank v. Turquand."

In 1890, 1891, etc., Stanly county, for the purpose already shown, put the bonds in question upon the market for sale. They were in due form, and contained the usual recitals. These bonds were purchased in due course of trade by the complainants, unaware of any defect of authority or other irregularity in their issue. There was nothing to excite suspicion of any defect or irregularity in their issue. The railroad was constructed; the county had its stock in the same, and had for years paid the interest on the bonds. The county was, each and every year, collecting from the railroad company taxes levied upon the property of the same. Under conditions like these, I consider it the duty of this court, as said by Justice Gray in the case above cited, to uphold the bonds,—to declare them valid,—if, under any circumstances, the court can do so.

I have shown that this court is not bound by the construction put upon these valid statutes by the supreme court of North Carolina in the Snuggs Case, years after the issue and sale of the bonds. It becomes necessary, then, to inquire as to what construction the court will put upon the statutes. In construing these sections of the Code, we must do it in the light of the rule laid down by Justice Gray in the Louisville, N. A. & C. R. Co. Case. This is an easy thing to do, when we consider the decision of Belo v. Commissioners, 76 N. C. 489. Indeed, it seems to us that if the principles laid down in that case had been called to the attention of the court in the case of Com-

missioners v. Snuggs, 121 N. C. 394, 28 S. E. 539, 39 L. R. A. 439, the decision would have been different. As I have already said, no bondholder was a party to that suit. It seems to have been argued, however, but there is no reference to the Belo Case in the opinion, and, from that, I take it, there was none in the argument. In addition to the leading opinion of the court, written by Justice Montgomery, there were two concurring opinions, and in none of them is there any mention of the Belo Case. This, to us, is remarkable, when we consider the fact that it is the leading case in North Carolina upon the subject of municipal bonds; and the more remarkable when we consider the principles there laid down, decisive of the case here in favor of the bonds and their validity. What are these principles? The supreme court, in 1877, in Belo v. Commissioners, 76 N. C. 489,—the leading case upon the subject of municipal bonds, and the effect of recitals in the bonds,—lays down the law as follows:

"While the decisions are very uniform that the records of the justice's court, affirming the fact of compliance with the conditions precedent to the subscription of stock, are conclusive and estop the county from denying the validity of the bonds in the hands of a bona fide holder before maturity, they are equally uniform in giving the same effect to the recitals in the bonds themselves that they had been issued in pursuance of the law which authorized their issue. The recital is a determination of the question, and the holder has a right to rely on it. Town of Coloma v. Eaves, 92 U. S. 484, 23 L. Ed. 579; Knox Co. v. Aspinwall, 21 How. 539, 16 L. Ed. 208. Mr. Justice Gray says: 'In the leading case of Knox Co. v. Aspinwall, the decision was rested upon two grounds. One of them was that the mere issue of bonds, containing a recital that they were issued in pursuance of the legislative act, was a sufficient basis for the assumption by the purchaser that the conditions on which the county was authorized to issue them had been complied with, and it was said the purchaser was not bound to look further for evidence of such compliance, though the recital did not affirm it. The position was supported by reference to the Royal British Bank v. Turquand, 6 El. & Bl. 327, in a case in the exchequer chamber, which fully sustains it.'"

Here the court in 1877 approved of the doctrine in the Royal British Bank Case, upon which Knox Co. v. Aspinwall was based,—the case Mr. Justice Gray bases his decision upon in the case of Louisville, N. A. & C. R. Co. v. Louisville Trust Co., 174 U. S. 573, 574, 19 Sup. Ct. 817, 43 L. Ed. 1081. The above are the words of Justice Gray,—the same used in the Belo Case by Justice Bynum; the leading case on municipal bonds in North Carolina.

To apply these rules to this case, what were the conditions on which the county of Stanly was authorized to issue the bonds? One was, "when necessary to aid in the completion of any railroad"; and another was, "of any railroad in which the citizens of the county may have an interest." Here was a power, legislative in its character, recited in the bond, to be exercised under certain conditions. By whom? The act says, the "board of commissioners." In June, 1889, an order was entered upon the record of the board of commissioners of Stanly county, when they came to consider the proposition to subscribe to the capital stock of the Yadkin Railroad, a part of which was as follows: "It appearing that the citizens of said county have an interest in said railroad," etc. In this same order, reference time and again was made to the Yadkin Railroad and its construction, and

to the conditions upon which it was to be constructed. Among others, it was ordered that "said railroad shall be of standard gauge." It appeared then to the board, and they (the commissioners) acted upon it, that there was a railroad to be completed,—constructed,—and that the citizens of the county had an interest in it. These were the conditions to be complied with, and some authority had to pass upon the same. It was not for the innocent purchaser of the bond to inquire as to whether the conditions were complied with, but for the municipal authorities who put it upon the market, and the recital in the bond that it was issued in pursuance of the power conferred by the sections of the Code "was a sufficient basis for the assumption by the purchaser that the conditions on which the county was authorized to issue it had been complied with." Belo's Case, supra. The proceedings had before the board of commissioners of Stanly county, printed in the record, show that the corporate authorities acted with the sections of the Code recited in the face of the bond before them, and that they passed upon all questions left for their determination, as said by Justice Brewer in his opinion in the Mercer Co. Case, 170 U. S. 601, 18 Sup. Ct. 791, 42 L. Ed. 1156. It shows these corporate authorities were acting in good faith, and wanted to perform their duty, according to law. On page 660, 30 C. C. A., and page 307, 87 Fed., in the case of Township Ninety-Six v. Folsom, the circuit court of appeals, speaking through Judge Jackson, says:

"It will be observed from the inspection of these bonds that their recitals show upon the face of the bond a compliance with the law under which they were issued. The purchaser had a right to assume that all the conditions of the law were complied with, authorizing the issue of the bonds. The question whether they were issued in compliance with the law was a question that properly belonged to the authorities who were authorized by the acts of the legislature to issue the bonds."

Purchasing these bonds with the recitals they contained, was it required of the purchasers to find out whether the citizens of the county of Stanly had an interest in the railroad? Was it required of them to find out whether the railroad was completed or uncompleted? These are matters for the corporate authorities, and for them alone. Says Justice Brewer in Provident Life & Trust Co. v. Mercer Co., 170 U. S. 601, 18 Sup. Ct. 791, 42 L. Ed. 1156:

"By a long series of decisions, such recitals are held conclusive, in favor of a bona fide holder of bonds, that precedent conditions prescribed by statute, and subject to the determination of those county officers, have been fully complied with."

In the case of Provident Life & Trust Co. v. Mercer Co., 170 U S. 601, 18 Sup. Ct. 788, 42 L. Ed. 1156, it will be seen that the recitals in the bond, which are printed in the volume, are similar to those in the Stanly bonds. See, also, the recent case of Gunnison Co. v. E. H. Rollins & Sons, 173 U. S. 255, 19 Sup. Ct. 390, 43 L. Ed. 689, as to recitals in bonds; also School Dist. v. Rew (C. C. A.) 111 Fed. 1.

We understand the rule to be that the purchaser has to look no further than to ascertain if a power has been granted to issue the bonds. If there is a power, then he can depend upon the recitals in the bonds for the proper exercise of that power.

The above are the rules which have obtained in North Carolina since 1877,—the first time they were considered. They are to be found in the case of Belo v. Commissioners, 76 N. C. 489; and in the light of the same, so clearly and forcibly stated by Justice Bynum, we must assume, if that case had been called to the attention of the court when the Sniggs Case was argued, as suggested by Judge MORRIS, the decision might have been different. In Union Bank v. Commissioners of Town of Oxford, 116 N. C. 368, 21 S. E. 419, the court says:

"The purchaser of such coupons as those sued upon must so far act upon the notice contained in the recitals, as a general rule, as to examine the statutes referred to, and ascertain at his peril whether the essential prerequisites to the validity of the bonds have been met both by legislative and popular action. We hold that upon a fair construction of the organic law and pertinent statutes, and their application to the facts of this case, there has been a sufficient compliance with the essential requirements of the law to render the election valid. We think, therefore, that the court erred in holding that the plaintiff was not entitled to recover, and the judgment of nonsuit must be set aside and a new trial granted."

The recitals in the bonds in question, as they appear in the record, are:

"This bond is one of a series of eighty of the denomination of one thousand dollars each, and forty of the denomination of five hundred, issued by authority of an act of the general assembly of North Carolina ratified the third day of March, 1887, entitled 'An act to amend the charter of the Yadkin Railroad Company,' and of sections 1996, 1997, 1998, and 1999 of the Code of North Carolina, and authorized by a majority of the qualified voters of Stanly county at an election held for that purpose on the 15th day of August, 1889, duly ordered by the board of commissioners of Stanly county."

Under the decision in the Belo Case, and the rule to which the court calls attention in Union Bank v. Commissioners of Town of Oxford, both referred to above, the purchaser of the bonds "had only to examine the statutes referred to, and ascertain, at his peril, whether the essential prerequisites to the validity of the bonds have been met both by legislative and popular action." These sections of the Code recited in the bond as authority for their issue were passed by the legislature according to the constitution, and there is no doubt but that there was a large majority of the voters of the county of Stanly in favor of the issue of the bonds. These things are admitted. So that the bondholder had to look no further than to see if there was a power conferred to issue the bonds. The performance of the conditions was a matter to be determined by the corporate authorities. The bondholders had the right to rely on the recitals for that. They did rely on them. They did all that was required of them.

It was contended by the appellants in the argument that the provisions of section 1996 of the Code refer only to those roads that were unfinished in April, 1868, the time of the adoption of the constitution; and in support of this the attention of the court is called to the following:

"This reasoning leads us to the still further conclusion that, at the time when the act of 1868–69 was brought forward, in the Code (section 1996 and the four succeeding sections), it could have had reference to no cases

except those where the counties had a pecuniary interest in unfinished railroads at the adoption of the constitution of 1868." Commissioners v. Snuggs (1897) 121 N. C. 403, 28 S. E. 542, 39 L. R. A. 439.

This case was decided in 1897. The statute of April 10, 1869 (section 1996 of Code), made no reference to the constitution of 1868, nor to any other point of time in the past. Every word in section 1996 denoting tense is in the future tense, and the Code went into effect. November 1, 1883. It is a universal rule of construction that all statutes are prospective in their operation, unless the statute itself says to the contrary. "No statute should be given a retrospective operation unless its words expressly require such construction." State v. Littlefield, 93 N. C. 614. What words in section 1996 require that its operation be referred to April, 1868,—15 years before it was re-enacted in the Code, and one year before it was ever put in any shape on the statute books of North Carolina? "Upon the same principle of construction, if section 1996 should be re-enacted in the Code of 1900, it would have no application to any road that might be built during the next century, but would apply to roads incomplete in the year 1868,—thirty-two years before its enactment." This principle has been passed on by the supreme court of the United States in James v. City of Milwaukee, 16 Wall. 159, 21 L. Ed. 267. In that case a statute authorized a city to lend its credit to any railroad company incorporated and organized, and the court held that companies thereafter organized were intended to be included, and the statute was applicable to them as well as those in existence. The court said (16 Wall. 160, 161, and 21 L. Ed. 267):

"The defendant in error insists that the power conferred was confined to companies already in existence at the date of the act, and such was the opinion of the court below. We entertain a different opinion."

In that case there was no word denoting the future tense,—no "shall," as in section 1996,—but the only words used were "incorporated" and "organized."

In this connection we observe that the supreme court of North Carolina, in the Snuggs Case, has construed the words of section 1996 of the Code, "the citizens of the county may have an interest," not to mean what the language imports. The court holds that these words require the county, as a county, to have a pecuniary interest in the railroad, in order that the section may apply. In answer to this, it is only necessary to say no such words are to be found in section 1996 of the Code. This construction takes out the words "the citizens," and inserts the word "pecuniary," and thus it holds that the words "any railroad in which the citizens of the county may have an interest" are to be construed as follows, to wit: "any railroad in which the county has a pecuniary interest." A mere statement of such a construction is enough to refute it. Here we may call attention to the language of article 5, § 6, of the constitution of the state, when it was dealing with the question of the right of the state to issue railroad aid bonds. There it refers to a railroad "in which the state has a direct pecuniary interest." This section 1996 of the Code was adopted about one year after article 5, § 6, of the constitution. Doubtless the legislators had be-

fore them this provision of the constitution, or at least were familiar with it. The difference in the language was obviously intentional and significant.

The history of the adoption of this provision of the state constitution as to state railroad aid bonds shows that it had a different purpose from that of the Code (sections 1996-2000). The report of the treasurer shows that prior to the meeting of the convention the state had undertaken to issue its bonds in aid of certain railroads, and that under the statutes then existing the state was liable to be called upon for the issue of additional bonds, or for the guaranty and payment of additional bonds; and the state owned stocks in certain railroads, thus having a direct pecuniary interest in them. The amendment made to section 5, article 5, of the constitution, above quoted, was designed to enable the state, without a vote of the people, to carry out its contracts already entered into on railroads, etc., already begun, and to protect its interest in the railroads, etc., already begun. With a vote of the people, the state was allowed to aid railroads, without restriction. As the constitution (article 7, § 7) did not allow counties to incur any debt in any case, except for necessary expenses, without a vote of the people, the reason for the provision as to unfinished railroads in case of state aid did not apply to counties, and was purposely omitted in the act of April 10, 1869 (now sections 1996-2000 of the Code). This view is supported by the following decision rendered by the North Carolina supreme court in 1869,—the year following the constitutional convention. In Galloway v. Jenkins, 63 N. C. 147, the suit was to enjoin an issue of state bonds in aid of the railroad company. The court held that the bonds were unauthorized, under the provisions of the constitution. In the course of the opinion (Pearson, C. J., writing the same) the court says with respect to the restriction of the power of the state to incur debt,—speaking of the debt existing at the time of the adoption of the constitution of 1868 (page 153):

"It will be found that most of the public debt was incurred in three modes: (1) By subscribing for stock in railroad and navigation companies, and issuing bonds to pay for the stock; the state becoming a member of the corporation. This is the heaviest item, and amounts to, say, eight million dollars. (2) By issuing bonds of the state, and exchanging such bonds for a like amount of the bonds of the corporation; the state not becoming a stockholder, and taking the collateral security, of more or less value. This is the next heaviest item, and amounts to about three millions of dollars. (3) By indorsing the bonds of corporations, and taking a mortgage or some other collateral security. This item amounts to two millions. These are the three modes by which, judging from the past, it was apprehended the public debt might be so run up as to ruin the credit of the state, and tarnish her honor and her reputation for good faith. [Page 155.] The suggestion that the credit of the state was given by this statute to aid in the completion of an unfinished railroad was not strongly urged on the argument, and, indeed, it could not be. An unfinished road is one that has been begun and partly worked on, and such a road is made an exception on the ground that it might be proper to finish it, in order to prevent a sacrifice of the work that had been done. There is no evidence that such was the fact in regard to this road. The other suggestion, that the state has a direct pecuniary interest in this road, was properly abandoned. The word 'has' is in the present tense. The exception is obviously confined to roads in which the

113 F.—46

state had a direct pecuniary interest at the time of the adoption of the constitution; otherwise the state might, by a subscription for stock, become directly interested in every railroad or navigation scheme that should thereafter be projected, and thus the restrictions of the constitution would be of no effect whatever."

Note the difference of the language of the constitution as to state aid bonds and the language of the Code as to county aid bonds. The constitution says "has," and note the comments of the court on the present tense. The Code says "may have," etc. The words used are different, and the purposes are different.

Such of these decisions of the supreme court of North Carolina as were rendered after the bonds in question were issued are not binding upon this court, and it is both the right and duty of this court to construe this language of sections 1996–2000 according to the natural and proper meaning. Within the meaning of section 1996 of the Code, the citizens of a county have an interest in any railroad running into or through the county.

It is insisted by appellants that there was a policy of the state of North Carolina, as evidenced in the constitution of the state adopted in 1868, against issuing railroad aid bonds, by either the state or counties, except in aid of roads which were unfinished at the time of the adoption of the constitution. There was no such policy. The only policy was this: that no state bonds should be issued to aid any new railroads unless there should be a vote of the people, but with such a vote the state could aid any railroad, whether it had been begun or not at the time of the adoption of the constitution. If the railroad had been begun and was unfinished at the time of the adoption of the constitution, state bonds might be issued in aid thereof without any vote of the people. As to counties, there was no distinction made as to whether the road was finished or unfinished at the time of the adoption of the constitution. A vote of the people of the county was required for the issuance of railroad aid bonds of a county in either case, whether a road had been begun or was a new railroad; and there was absolutely no distinction whatever made in the constitution between new roads and unfinished roads, so far as respects county aid, and no such distinction existed in the Code or in any other provisions of the statute. The definition given the word "completion," as it appears in section 1996 of the Code of North Carolina, by the supreme court in Commissioners v. Snuggs, 121 N. C. 394, 28 S. E. 539, 39 L. R. A. 439, we think, with great respect, is too narrow, too refined. The court says it is not used in the sections of the Code suggested as synonymous with "construction," but the language here requires that there must have been an unfinished road. The court went further, and, as I say, held that there must have been a road unfinished at the time of the adoption of the constitution of April 24, 1868, in order that these sections of the Code might have application. This interpretation of the word "completion" is not the correct one, as it seems to me. It is used as synonymous with "construction." This view is, we think, supported by the obvious difference between this language and the language used in the state constitution, as respects the is-

sue of state railroad aid bonds. Article 5, § 4, of the constitution, prohibits the issue of state railroad bonds, "except to aid in the completion of such railroads as may be unfinished at the time of the adoption of this constitution." Section 1996 of the Code, adopted April 10, 1869, about one year after the framing of this provision of the state constitution, omits the significant words, namely, "unfinished at the time of the adoption of this constitution." "On no possible theory can these words be read into the statute. The legislature did not put them there, and the courts cannot put them there." The legislature, as before said, with the constitution before it, wrote the act of April 10, 1869, in the light of the words of the constitution; and, if it was its purpose in that enactment to make both the same, the same words would have been used. Different words were used, as the purposes were different. In this interpretation of the word "completion," it is well to observe the rule as laid down by Justice Brewer, in Provident Life & Trust Co. v. Mercer Co., 170 U. S. 602, 18 Sup. Ct. 788, 42 L. Ed. 1156. In that case the justice says the meaning of a word "is often qualified by the context." He illustrates this by a reference to what is said in Bunyan's Pilgrim's Progress: "As I walked through the wilderness of this world, I lighted on a certain place, where there was a den, and laid me down in that place, to sleep." The writer does not mean that he passed from one end of the wilderness to the other, but "simply, that as he traveled in the wilderness he lighted on the den." So we must look at the context in this interpretation. In the foregoing I have kept in mind the rule laid down by Mr. Justice Gray in Louisville, N. A. & C. R. Co. v. Louisville Trust Co., 174 U. S. 552, 19 Sup. Ct. 817, 43 L. Ed. 1081, already quoted in this opinion, that if, under any circumstances, the court can uphold bonds issued as the bonds in question were, it will do it.

To proceed further in the argument, already longer than intended, it is admitted that the board of commissioners of Stanly county was proceeding under the provisions of sections 1996, 1997, et seq., of the Code, as well as under the act of March, 1887. If this be true, then the bonds are valid, notwithstanding the recitals, provided the Code provisions conferred the power to issue them on the board. Knox Co. v. Ninth Nat. Bank, 147 U. S. 91, 13 Sup. Ct. 267, 37 L. Ed. 93; City of Cairo v. Zane, 149 U. S. 122, 13 Sup. Ct. 803, 37 L. Ed. 673; Anderson Co. v. Beal, 113 U. S. 227, 5 Sup. Ct. 433, 28 L. Ed. 966. The defendants contend that these sections did not authorize the issue of the bonds, for the following reasons, also: Because said statutes are not local and special, as required by sections 1, 6, and 7 of article 5 of the constitution of North Carolina. In this connection there is no evidence in the record that the payment of the interest or principal of these bonds will require a county tax to exceed the double of the state tax. And further, under the decisions of the supreme court of North Carolina, this constitutional provision does not affect the validity of the bonds, and in no view of the case could affect more than the method of having a valid, existing, and binding obligation paid. "The legislative practice has uniformly been, as far as we know, to give approval in advance, and thus confer the requisite legal author-

ity to levy special taxes beyond the assigned limits, though, if given after the levy, it would doubtless be equally effectual." Cromartie v. Commissioners, 87 N. C. 140. In Herring v. Dixon, 122 N. C. 423, 29 S. E. 369, the supreme court again distinguishes between the power to confer a valid indebtedness without special legislative sanction, and the power to levy a tax to pay said indebtedness, when it says:

"In Vaughn v. Commissioners, 117 N. C. 429, 23 S. E. 354, while it was held that the commissioners could incur a debt for necessary expenses without a vote of the people, it was not held that they could levy a tax in excess of the constitutional limit to pay it, without special approval of the legislature."

So, under the rulings of Cromartie v. Commissioners and of Herring v. Dixon, the commissioners have the right to contract a valid debt without a special act. Here the money is in the hands of the trustee of the complainants, and no levy of any tax is necessary or asked. When a state law confers a general power on a county to subscribe to the stock of any railroad in the state for any amount, not exceeding $100,000, the county may subscribe to the stock of two railroads, $100,000 each. Chicot Co. v. Lewis, 103 U. S. 164, 26 L. Ed. 495. In Daviess Co. v. Huidekoper, 98 U. S. 104, 25 L. Ed. 112, the court upholds a subscription under a general statute of Missouri, almost identical in language with section 1996:

"Where an innocent purchaser buys bonds (negotiable securities) which recite that they were issued to fund a debt of the municipal corporation, the question of excessive indebtedness does not arise, and the purchaser is not required to consider or inquire concerning it." School Dist. v. Rew (C. C. A.) 111 Fed. 1.

The supreme court of North Carolina, in a late case (City of Charlotte v. Shephard, 122 N. C. 603, 29 S. E. 842), says that:

"Where such a corporation [speaking of a municipal corporation] has thus acquired the right to create a debt and issue the bonds, this power carries with it the power to levy the taxes necessary to pay said bonds and the accruing interest thereon."

Ralls Co. Ct. v. U. S., 105 U. S. 733, 26 L. Ed. 1220; U. S. v. City of New Orleans, 98 U. S. 381, 25 L. Ed. 225.

This doctrine of the North Carolina court is supported fully by the two decisions cited above.

The importance to all parties in interest, the amount involved, and the care with which the case has been presented to the court by counsel, seemed to demand a full discussion of its principles; and on that account I have gone over the entire record and the briefs filed, giving to them the best consideration in my power. The conclusion reached is that these bonds are valid bonds.

It follows that the decree entered in the circuit court in the Stanly Case, 89 Fed. 257, should be affirmed.

GOFF, Circuit Judge. I dissent from the opinion of the court, as well as from the judgment entered in this case.